## ST. LOUIS CATERING COMPANY v. T. H. GLANCY et al., Appellants.

Division One, June 16, 1922.

1. **CONVERSION OF CHATTELS: Possession.** In order to maintain an action for the conversion of chattels, it is necessary for the plaintiff to have had possession, or to have been entitled to immediate possession, at the time of the conversion. Title to or a

right of property in the chattels seized, will not alone support an action of conversion.

2. ————: **Delivery to Creditors' Committee: Effective as Assignment.** Where plaintiff, a corporation, having become insolvent, addressed a letter, ratified by its board of directors, to a committee of its creditors, whereby it authorized said committee to operate, conduct and manage its restaurant and bar and to sell its interest therein upon such terms as the committee might see fit, and shortly thereafter turned over to the committee its cash on hand, its accounts and stocks and all its other chattels, and said committee took possession and proceeded to assume full management and control, removing the manager and appointing another, reducing salaries, purchasing supplies in their own name, collecting the moneys paid by guests, paying current bills as they accrued, paying from the proceeds dividends to the various creditors, and performing practically every function plaintiff corporation could have performed, said plaintiff was not in possession, or entitled to immediate possession, and cannot maintain an action for conversion for fixtures, fittings, furniture and liquors appurtenant to said restaurant and bar appropriated by defendant, under a claim of ownership, at a time when said creditors' committee had not released or relaxed their possession or control; for such letter and the committee's subsequent course of dealing with the property and business for the sole use of the creditors amounted substantially to an assignment or conveyance in trust for the benefit of plaintiff's creditors.

3. ————: ————: **Appropriation to Pay Debts: Technical Assignment.** A debtor, insolvent or otherwise, who is desirous of appropriating his property to the payment of his debts, is not compelled to resort to a technical statutory assignment. If in good faith, by a proper instrument, he transfers a certain business and all chattels appurtenant thereto to a committee of creditors, to be operated by them and the proceeds to be used ratably to pay his creditors, and said transfer is followed by the surrender of the actual possession to and its subsequent sole control and management by said committee, both the legal and equitable title of the property passes beyond his control, and it becomes a trust fund in the hands of the committee for the payment of his creditors, and until they are paid he is not in such possession as will authorize him to maintain an action in trover against a third party who has wrongfully appropriated the property to his own use; but if any one is authorized to maintain such action under such circumstances, it would be the creditors' committee.

Appeal from St. Louis City Circuit Court.—*Hon. Karl Kimmel*, Judge.

REVERSED.

*Jourdan, Rassieur & Pierce* for appellants.

(1) The plaintiff did not have possession or the right to possession at the time of the alleged conversion. (a) To recover in trover, plaintiff must show that it was in possession or had the right to possession at the time of the alleged conversion. Bank v. Tiger Tail M. & L. Co., 152 Mo. 145; Cook v. Smith, 200 Mo. App. 218; O'Toole v. Lowenstein, 177 Mo. App. 662; Schwald v. Brunjes, 139 Mo. App. 516; Bowers, Conversion, p. 281, sec. 383; 38 Cyc. 2045; sec. 2; 27 R. C. L. 1131, sec. 41; Golden v. Moore, 126 Mo. App. 518. (b) Mere ownership or title without possession or right to possession is not sufficient. Bank v. Tiger Tail M. & L. Co., 152 Mo. 145; O'Toole v. Lowenstein, 177 Mo. App. 662; Schwald v. Brunjes, 139 Mo. App. 516; 38 Cyc. 2045, sec. 2; Bowers, Conversion, p. 281, sec. 383. (c) The letter of May 27, 1915, whereby the assets were turned over to the creditors' committee, and the acts done in pursuance thereof, constituted an assignment for the benefit of creditors under the statute. Secs. 623-665, R. S. 1919. (d) It was a voluntary assignment or transfer made by a corporation by authority of its board of directors of all of its property to a creditors' committee for the equal benefit of all of its creditors, which is the exact definition of an assignment under the statute. Sec. 623, R. S. 1919; Calumet Paper Co. v. Prtg. Co., 144 Mo. 331. (e) The failure to acknowledge and record the instrument does not impair its validity as an assignment for the benefit of creditors. Rosenthal v. Frank & Dyer, 37 Mo. App. 272. (f) The fact that no statement of the property assigned accompanied the instrument of assignment does not invalidate it under the statute. Hartzler v. Tootle, 85 Mo. 23. (g) The fact that the creditors'

committee (the assignees) neglected to make out schedules does not render the instrument inoperative under the statute. Duvall v. Raisin, 7 Mo. 449. (h) ·The omission by the assignee to perform any duty imposed upon it by the statute would not deprive the creditors of their right to have the assignment administered under the statute. Hardcastle v. Fischer, 24 Mo. 70; Wynn v. Madden, 18 Mo. App. 261. (i) If the letter in question was not an assignment under the statute, then, at common law, it operated as a conveyance in trust for the benefit of creditors. The assignment statute did not abolish the common-law right of a debtor to make a conveyance in trust in good faith for the benefit of creditors. Brookshire v. Ins. Co., 91 Mo. App. 599, 605; Jaffrey v. Matthews, 120 Mo. 317. (j) It was not necessary for the instrument to contain technical words such as "grant, bargain, sell, convey or transfer." Any acts or words are sufficient to convey the title of the insolvent to the trustee where such is the clear intention of the parties. Wittmore v. Hastings, 51 Mo. 171; Shepard v. McNail, 122 Mo. App. 418; Lyle v. Burke, 40 Mich. 499; Underhill on Trusts & Trustees (Wislizenus), p. 19, chap, 2, art. 6. (k) Where an insolvent has made an assignment for the benefit of creditors, the assignee or trustee is the only party entitled to possession of the insolvent's assets and is the only person that may sue in trover for damages for conversion. State ex rel. Waggoner v. Lichtman & Co., 131 Mo. App. 68; Haose v. Distilling Co., 64 Mo. App. 131. (l) A delivery or transfer of assets by an insolvent to another for the benefit of creditors, even though it be not an assignment under the statute, divests the insolvent of all title or interest in the property and right of possession thereto and such trustee is the only party that may sue in trover for damages for conversion. Wright v. Euless, 12 Tex. Civ. App. 136, 34 S. W. 302; Calumet Paper Co. v. Prtg. Co., 144 Mo. 331, 339; Liebowitz v. Brinn, 113 N. Y. Supp. 685; Wittmore v. Hastings, 51 Mo. 171. (2)

Even if plaintiff were in possession or entitled to possession at the time of the alleged conversion, yet defendants at the same time were joint or co-owners of the property in suit. (a) Trover will not lie against one joint owner by the other. Bowers on Conversion, p. 171, sec. 232; Merrill v. Mason, 159 Mo. App. 605; Sheffler v. Mudd, 71 Mo. App. 78. (b) The relation that was created between the Catering Company and the Hotel Company under the contract in question was that of a "joint adventure." 15 R. C. L. 500 et seq.; 23 Cyc. 452 et seq. (c) Where property is purchased under a joint adventure, the one holding title will be regarded as trustee for all the parties thereto, and property paid for out of the receipts of the adventure becomes the joint property of the parties to the adventure. 23 Cyc. 455, sec. F; 15 R. C. L. 504, sec. 6. (d) The rights of the parties to a joint adventure are governed and controlled by the law of partnership. 15 R. C. L. 500, sec. 2, note 4. (e) One partner (or joint adventurer) cannot sue the other in trover. 2 Rowley on Partnership, p. 1054, sec. 759; Weiss v. Weiss, 133 N. Y. Supp. 1021. (3) Because under the contract existing between the parties, the plaintiff, even if it had complied with it, was not the absolute owner of the property in suit. The only right the plaintiff had was to use the property upon the premises in question to September, 1917. At best, the defendants only excluded the plaintiff from this right, and its remedy, if any at law, is for damages for breach of this contract right and not in trover.

*Sears Lehmann* and *Lehmann & Lehmann* for respondent.

(1) Appellants' main contention is that the catering company made a general assignment for the benefit of creditors to a creditors' committee. The so-called "general assignment" is the letter of May 27, 1915. This letter is certainly clear and unambiguous and does not call for construction, but it so happens it was con-

strued in writing by the Catering Company who wrote it, by the creditors' committee, who received it, and by defendants who were third parties and utter strangers to it. The constructions are all the same, i. c. that the Catering Company still owned its assets and was in control and possession of them and that the creditors' committee was assisting in its management and liquidation as its agents under the control and supervision of its board of directors. We respectfully submit that there has never been presented to this court a more frivolous contention than this of appellants that the above letter of May 27th, was a general assignment for the benefit of the creditors. The plaintiff was the owner of, entitled to possession of and in possession of the property when it was seized. (2) The contention is that defendants had a part interest in the property and could therefore take the whole of it without liability and the contention is that the seizure was rightful, and that conversion does not lie because no demand was made. The evidence shows defendants had no part or interest in the property and therefore the legal proposition that if so, they could take it all is immaterial; but nevertheless a part owner is liable to the co-owner for conversion. The evidence showed that the seized property was bought, paid for and in the possession and use of plaintiff in a space leased by plaintiff from defendants. As to the seized food and liquors amounting according to defendants to $1304, the defendants did not even claim an interest. As to the furniture and equipment a half interest was claimed by defendant because of the following terms of the lease: (a) In addition to a monthly payment of $300 plaintiff was to pay defendants yearly one-half the surplus it received from operating the restaurant after deducting operating expenses and one-tenth of what it paid for the installation of the said equipment. (b) The provision that at the termination of the lease if the defendants had fulfilled the terms thereof they were to have a joint interest in the property and the right to purchase

it for half its value. The lease had over a year and one-half to run. It had not terminated with the obligations of defendants fulfilled, and hence of course, this clause did not apply. The contention that the defendants had a half interest in the property is equally groundless with the one that there was a general assignment. Defendants having no half interest in any part of the property seized, the contention that such part interest in part of the property justifies seizure of the whole is immaterial, but even appellants' immaterial contentions are groundless for conversion does lie between one co-owner and another. McCoy v. Hyatt, 80 Mo. 139; Merrill v. Mason, 159 Mo. App. 309. The food and liquor in which plaintiff it is admitted had a whole interest was of course completely used up by defendants, and according to defendants' testimony much of the other property was worn out by them. (3) The contention is made that under the lease defendants had a right to seize the property herein to regulate mismanagement. By no tortured construction of the lease was this right given, and under the defendants' own testimony the property was taken for their own use, "because it was there" and they wanted the restaurant and was not taken for the purpose of "correcting mismanagement." It was not even pretended the property was taken to regulate mismanagement. Nearly five years afterward counsel stated at the second trial the evidence as to mismanagement was on the issue of punitive damages only and not admissible except on this issue. Mr. Glancy wanted the property. He wanted to buy it, but not at the price fixed by the owner or a neutral appraiser, but at his own price. Before seizing it he had an auctioneer check it up and value it to be ready as an expert to testify when he was sued for its value. He took it confessedly intending to keep it for himself, and he had so kept it at the trial nearly five years. It was a wilful, deliberate, conscious wrongful act, on the theory that the property could be obtained that way cheaper,

than by purchase from the owner, which theory turned out to be correct. (4) This court should award appellee ten per cent of the judgment below as damages. Sec. 1515, R. S. 1919.

ELDER, J.—This is an action for damages for conversion of the furnishings, equipment and supplies used in connection with the operation of the restaurant and buffet of the Marquette Hotel at St. Louis. Plaintiff claims to be the owner and entitled to the possession of the property alleged to have been converted. Defendant T. H. Glancy is president and majority stockholder of defendant Glancy & Watson Hotel Company, which operates the said hotel.

The petition of plaintiff alleges that on the 25th day of January, 1916, it owned and had possession of a lot of tables, chairs, linen, china, stoves, kitchen utensils, tapestries, food, groceries, wines, liquors, supplies and other restaurant property and appurtenances, all of the value of $30,000, situated in the hotel building; that defendants "maliciously, fraudulently, wrongfully, illegally, wantonly and wilfully seized, took and converted to their own use, secretly without the knowledge and consent of plaintiff, all of plaintiff's said property" (which is thereupon itemized); that immediately after the taking thereof plaintiff demanded back its property, but defendants refused to return the same. The prayer of the petition is for $30,000 actual damages, with interest, and $30,000 punitive damages.

The answer of defendants is joint, and consists of a general denial.

The evidence shows that some time prior to 1906, defendant T. H. Glancy and one M. D. Watson came to St. Louis from Texas, started in the hotel business as partners, under the firm name of Glancy & Watson, and erected the Marquette Hotel; that later, in the year 1907, the business was incorporated; that Glancy & Watson, being but little known in St. Louis, and the building erected by them being in a new part of the city,

had been somewhat discouraged in the promotion of their enterprise; that they thought if they could get the plaintiff company, which operated Faust's, a well known cafe in St. Louis, to take over the restaurant privileges in their hotel, so that they could advertise that the cafe was conducted by the same management as Faust's it would give them some prestige; that accordingly, as the hotel was nearing completion, on October 10, 1906, the firm of Glancy & Watson entered into a written agreement with the plaintiff company whereby it was provided substantially as follows: Glancy & Watson were to lease to plaintiff, for a term of ten years, beginning on the day that the Marquette Hotel was opened for guests, certain portions of the premises of the hotel for the purpose of conducting therein a restaurant and bar; plaintiff was to be given the exclusive right to sell wines, liquors and food in the hotel building, with the right to dispense the same in guest rooms, billiard rooms and bowling alleys whenever ordered by guests; Glancy & Watson were to furnish all light, heat, hot water and steam required by plaintiff in the conduct of said business, the light and heat to be paid for by plaintiff monthly at the end of each month at the rate of $300 per month, and water to be paid for by plaintiff at the same rate as that charged therefor by the city of St. Louis; plaintiff was "to establish and maintain in said premises a cafe and bar similar to and of the same standard as Faust's Restaurant at St. Louis, and to furnish for use in said premises appropriate fittings and fixtures to cost not less than fifteen thousand dollars and not to exceed twenty thousand dollars;" plaintiff was to pay Glancy & Watson a further sum "equal to one-half of the net profits of said business, the said profits to be ascertained by charging against the gross receipts all legitimate expenses of conducting the said business, all amounts paid for additional china, silverware, linen and other furnishings, light, heat, supplies, insurance, license fees and taxes, all losses on account of unpaid bills of patrons,

and one-tenth each year of the amount that shall be originally expended by the party of the second part [plaintiff] for fixtures, fittings and funishings." The agreement further provided that all furnishings, fittings and fixtures installed, and any additions thereto, or restorations thereof, should be first approved by Glancy & Watson; and that at the termination thereof "the obligations of the parties of the first part [Glancy & Watson] being full performed, the fixtures, fittings and furnishings of the said restaurant and bar installed in said premises by the party of the second part shall be the joint property of the parties hereto, and the parties of the first part are to pay the party of the second part one-half of the value thereof." One of the concluding paragraphs of the agreement is as follows:

"It is agreed that inasmuch as said first parties are not only interested in results as to the management of said bar and cafe under this contract, but that the character of the Marquette Hotel is coupled with the proper management of said bar and cafe, which is expected to be of a certain appropriate standard as hereinbefore stated; therefore, it is agreed that said first parties [Glancy & Watson] have the right to correct and regulate any mismanagement, and in the event of any disagreement between the said parties of the first part and said second party as to any and all details in connection with the operation of said bar and cafe, difference of opinion shall be submitted to arbitrators, each of the parties hereto to select one arbitrator and they to select a third, and the findings of such three arbitrators shall be binding upon both."

The evidence shows that the Marquette Hotel was opened some time in September, 1907, and from that time on plaintiff operated the restaurant and bar. For the first seven years, or up until the close of the year 1914, the cafe and bar were conducted to the satisfaction of defendants, and the business always showed a profit at each settlement period. During each of these years ten

per cent of the cost of the original equipment was deducted from the gross profits, and plaintiff had thereby been reimbursed for seventy per cent of the original purchase price thereof. Replacements of equipment and supplies to the aggregate amount of $55,000 were also deducted from the gross profits during the seven years.

About February, 1915, the plaintiff company became financially involved and was unable to pay its creditors, who numbered about sixty and whose claims aggregated about $45,000. Plaintiff then operated Nagel's restaurant, in addition to the Marquette and Faust's. C. O. Baxter was at that time president and Eugene L. Clifford was secretary of the company. On February 9, 1915, pursuant to call authorized by the executive committee of plaintiff, a meeting of creditors was held at Faust's. At this meeting a creditors' committee, consisting of three creditors, was elected to make an investigation of the affairs of plaintiff, and it was decided that all future disbursements were to be made only with the approval of the committee. Thereafter several meetings of the board of directors of plaintiff were held, at which the sale of the Faust and Nagel branches was decided upon, and proposals for the purchase thereof were considered. A sale of Nagel's for $10,000 was approved on April 13, 1915.

On May 7, 1915, a further meeting of creditors was held. The creditors having become dissatisfied with the progress made by the creditors' committee theretofore appointed, it was resolved that a new committee be named to bring pressure upon the board of directors of plaintiff to sell the Faust and Marquette branches. A new committee of three creditors was thereupon appointed. The members thereof were: C. F. Blanke, chairman, a stockholder of plaintiff company, and also president of the Blanke Tea & Coffee Company, a creditor of plaintiff; R. B. Dumbell, manager of Swift & Company, a creditor of plaintiff; and Leo Wolfson, who ran a collection agency in St. Louis and who had frequently par-

ticipated in the handling of bankrupt estates. Wolfson, although not a creditor, had been authorized by a number of his clients, who were creditors, to represent them at the meetings of creditors, He was elected secretary of the committee. This committee held a number of meetings, sometimes in conjunction with the directors of plaintiff, all looking towards a solution of the financial difficulties of plaintiff. In the meantime, at the request of the creditors' committee, the several creditors, with one exception, refrained from taking individual action to enforce their claims.

On May 27, 1915, plaintiff delivered the following communication to the creditors' committee:

"St. Louis, May 27, 1915.
"Mr. C. F. Blanke, Leo Wolfson, R. B. Dumbell, Creditors' Committee:

"Subject to the approval of our board of directors *you are hereby authorized to operate, manage and conduct the Faust and Marquette Restaurant* belonging to the St. Louis Catering Company, and *you are authorized to sell* the Faust branch and *the interest of the St. Louis Catering Company in the Marquette branch upon such terms as you see fit.*

"St. Louis Catering Company,
"By C. O. Baxter,
"President."

(Italics ours).

This letter was formally approved at a meeting of the board of directors of plaintiff held June 8, 1915. At this meeting, owing to the absence of E. L. Clifford, Leo Wolfson was appointed acting secretary of plaintiff, with all the powers of the secretary. On August 1, 1915, Clifford served his connection with plaintiff, and Wolfson continued as secretary.

On May 28, 1915, the day following the delivery of the above-mentioned letter to the committee, the following letter was sent by the committee to all of the creditors:

294 Mo.—29

"St. Louis, Mo., May 28, 1915.

"To the Creditors of the St. Louis Catering Company,

"St. Louis, Mo.

"Gentlemen:

"After several meetings with the directors of the Catering Company, *they have this day given us possession of the assets of the company, which includes Faust's, the Marquette Cafe, the contents of both, the outstanding accounts and cash on hand, for the benefit of the creditors.*

"The Nagel branch was disposed of for eight thousand dollars cash, and this amount is in bank intact and with what we can retain out of the other cash in bank and amounts realized from sales, will as soon as possible be distributed among the creditors.

"A matter of leases must be settled before a distribution of cash on hand can be made, and this will be settled in a very short time.

"Negotiations are now on for the sale of Faust's and the Marquette Cafe, the aim of the directors anh your committee is to make these sales without closing the doors.

"It is absolutely necessary that your account be in our hands, and we ask that you forward at once to the chairman a statement showing the amount due you.

"Very respectfully,

"C. F. BLANKE,

"Chairman Committee of Creditors, Seventh and Clark Avenue."

(Italics ours).

The creditors' committee, acting through Wolfson, thereupon proceeded to assume charge of and operate the restaurant and bar at the Marquette Hotel, as well as to close the sale of the Faust branch. All open accounts, cash in bank, a share of stock in the Glancy & Watson Hotel Company, some bonds of the Kinloch Telephone Company, and all other property of plaintiff was also turned over to the committee. In response to the communication sent the creditors, they all sent in their accounts to the committee and acquiesced in the administration of plaintiff's affairs by the committee, receiving the payments on account from time to time made by it. In operating the Marquette branch, Wolfson conferred at times with Mr. Blanke, chairman of the committee. On June 1, 1915, the committee, acting

through Wolfson, removed Henry Dietz, manager of the Marquette Cafe, and directed William Dingemann, the steward, to perform the duties theretofore imposed on Dietz. Dingemann was given written directions to reduce expenses in the operation of this branch. Thereafter the Marquette restaurant and bar was managed and operated by the creditors' committee up until January 25, 1916, the date of the alleged conversion.

On July 19, 1915, at a meeting of the directors of plaintiff, a report of the creditors' committee, reporting a sale of Faust's for $5,000, and the payment of a forty-five per cent dividend to creditors, was approved. At this meeting, C. O. Baxter resigned as president and director of plaintiff company, and Leo Wolfson was elected a director in his place. On November 4, 1915, at a meeting of the directors of plaintiff, the creditors' committee, having rendered another report, was instructed to continue the operation of the Marquette branch and pay dividends to the creditors from time to time.

In conducting the Marquette branch, accounts with tradesmen and supply houses were opened up in the name of the creditors' committee, and all bills were paid out of receipts coming into the possession of the committee. All bills incurred by plaintiff prior to the transfer of its property to the committee were sent to the committee, and it made pro-rata distribution thereof from time to time as funds were available. The committee continued to realize a profit on the operation of the Marquette branch. On August 25, 1915, the committee paid a further dividend of ten per cent to creditors, and in its report transmitting the same said:

"*We still have the Marquette branch intact,* and whereas June and July are losing months, we managed to show a balance on the right side, and this month shows a decided improvement. *We are operating at a minimum expense and will continue to do so until we can dispose of it to the advantage of creditors.*"
(Italics ours).

On October 15, 1915, the committee paid another dividend of ten per cent, and in its letter of transmittal said:

> "*We are using every endeavor,* with virtually no expense, *to preserve the remaining assets of the company,* in such a manner that they are paying a dividend, without impairing their future value, and will make another remittance to you as soon as practicable."

(Italics ours).

On November 27, 1915 the committee paid a fourth dividend of ten per cent, (aggregating seventy-five per cent in all), and said: "This is the fourth dividend paid you *since we took the business in hand.*" (Italics ours).

All of these letters were written on stationery of the committee.

T. H. Glancy, defendant, was called as a witness by plaintiff. He testified that from the time the Marquette restaurant was opened until about June, 1915, during which time Dietz was manager, they always had "plenty of stock, plenty of wines and liquors, and vegetables and everything, and good equipment, linen and everything;" that when the creditors' committee took charge they did not keep up the stock of wines, liquors and meats, but would run out of staples, like roast beef, during meal times, and would not have enough to go around; that they had no finger bowls, the napkins were ragged and torn, and for a while they used paper napkins; that they "went down and dug up old dishes that were discarded, in old barrels, and used those;" that he received many complaints from the guests and patrons of the hotel about the service and the character of dishes and linen being used; that the patrons wanted to know "what kind of a dump they were running;" that Leo Wolfson, member of the creditors' committee, was around but about once a day "only long enough to get something to eat;" that witness made complaint to Wolfson, who replied that he was "doing the best he could under the circumstances," and that he "had no money to buy any-

thing with;'' that all supplies bought were sent C. O. D. and they were ''coming up there with a little dab of this and a little dab of that;'' that the cashier ''would take money out of her own pocket, and one time borrowed seventy or eighty dollars from the bus boy, all the money the kid had, to last them over Sunday;'' that witness complained to Wolfson a number of times, and then complained to Mr. Blanke, chairman of the committee, as well as to everyone he thought had any connection with or control over the matter, but that the same conditions continued until January 25, 1916. Relating the circumstances attending the taking possession, the witness testified:

''Q. Three or four days before you took this over what took place, and about Mr. Wolfson? A. He wasn't around there, and it was getting around February, as Mr. Lehmann says, 'our big month,' and they had no money to handle it, a big crowd, and they tried to run the restaurant without any money or equipment; it would have been something awful. The August before we had an awful time, and that is the reason I took it over right then.

''Q. These two or three days that Wolfson wasn't there—A. I asked the cashier where he was, and she didn't know.

''Q. And that continued two or three days? A. And that continued two or three days.

''Q. On the third day, tell what happened, and about what time of the day was that? A. About five o'clock, half past five—

''Q. What did you do? A. I went in and told them I was going to run that place.

''Q. Did you get all the help together? A. I went to the heads of the different departments, and the head bar-tender, and got that crowd down into the kitchen, and I asked them if they wanted to work for me; they said they did. I told them if that didn't satisfy them they could quit, but from that minute they were on my pay roll. . . .

"Q. Now, did anybody, either Mr. Wolfson or Mr. Lehmann, ever make any demand on you and tell you to turn back the property? A. Not a thing.

"Q. As a matter of fact, they always wanted you to buy it and pay a fabulous sum for it? A. They wanted me to buy it, and I already paid half of it. And they said they wanted the St. Louis Catering Company to quit honorably, and I was the bird to make them quit honorably.

"Q. Just before you took it over what did you do, if anything, towards ascertaining the amount of supplies and stuff in the storeroom? A. I had Mr. Dingman take an inventory of everything under his charge, all the provisions and wines, and everything there, and the money they had there, I had it counted and turned over to Grabe.

"Q. Now, with respect to the property in each one of the parts of the hotel occupied by this cafe, what did you do about listing that and putting a valuation on it? A. The equipment?

"Q. Yes, the equipment. A. Well, I got Mr. Leonori, who I was told was an expert on furnishings of that character and its value, and I got him to make the inventory and set the prices on it. He went all through that himself, and he went and saw every article."

The value of the meats, wines, liquors and grocery stock is shown to have been $1304.57. The "reasonable market value" of the furnishings and equipment of the restaurant and bar, which the evidence shows had had eight years' usage, was fixed by defendant Glancy at $1500. The "fair, reasonable value" (not auction sale price) thereof, as fixed by R. U. Leonori who appraised the property, was placed at $1800. Over the objection of defendants, an inventory, showing the original cost price of the property to have been $20,430.34, was admitted in evidence.

William H. Grabe, secretary and treasurer of the Marquette Hotel Company, testified as to chipped dishes,

irregular silverware and paper napkins being used in the restaurant after the creditors' committee took charge; that the patrons complained, saying, "This place is degenerating into a common hashhouse;" that there was often a shortage of food and liquor, and that at times the bartender would have to run across the street to borrow a bottle of whisky; that every time he met Wolfson he complained to him. The witness further stated that he had been with Faust's cafe for ten years, and that the standard of service at the Marquette from about June 1, 1915, to January 25, 1916, was "absolutely not" of the same character and standard as that maintained at Faust's.

William Dingemann, steward at the Marquette, who had formerly worked at Faust's for two years, also testified that the standard of the Marquette cafe "couldn't compare with the Faust standard any more—it ran down." Witness further testified as to the insufficiency of supplies, the lack of funds to pay for goods sent C. O. D., and the complaints made to Wolfson. Witness stated that on several occasions they were obliged to use bed sheets for table cloths in the banquet hall.

Testimony of much the same character as the foregoing was also given by the head waiter, captain of the dining room, cashier and bookkeeper of the Marquette, and by patrons of the restaurant.

Leo Wolfson testified that after he was appointed on the creditors' committee he took charge of the Marquette branch as the active man of the committee and arranged for Dietz "not to come up there any more as I found out Mr. Dingemann had been really running it;" that Dingemann made daily reports to plaintiff, showing receipts and disbursements; that he (witness) was at the Marquette every day and checked up the accounts every second day; that all purchases were charged to the creditors' committee; that all bills were paid by check of plaintiff, countersigned by the creditors' committee; that complaints had been made to Dingemann,

who reported them to witness; that letters of complaint written by Mr. Glancy to Mr. Feuerbacher, vice president of plaintiff, had been passed to him; that on January 23, 1916, witness went to the hospital and remained there "a couple of days after the 25th." Witness grudgingly admitted that the Marquette and Faust restaurants, some open accounts, cash in bank, bonds of the Kinloch Telephone Company, and stock of the Glancy & Watson Hotel Company were turned over to the committee.

At the close of all the evidence, defendants requested instructions in the nature of demurrers to the evidence, which were refused by the court, exceptions being saved by defendants. On the contrary, the court gave a peremptory instruction in favor of plaintiff, reading as follows:

"The court instructs the jury that under the evidence in this case the plaintiff was the owner, and entitled to the possession of certain property which on or about the 25th day of January, 1916, the defendants took possession of and converted to their own use, and the verdict of the jury must be in favor of plaintiff and against the defendants."

The jury returned a verdict in favor of plaintiff for actual damages in the sum of $9,000, with interest thereon amounting to $2340, a total of $11,340. From a judgment rendered thereon defendants have appealed.

Defendants contend that the court erred in refusing to direct a verdict for them for the reason that plaintiff did not have possession of the right to possession of the property in question at the time of the alleged conversion.

Possession.

That it is necessary, in order to maintain an action for conversion, for the party aggrieved to have possession, or to have been entitled to possession, at the time of the conversion, is well settled. [Bank v. Tiger Tail Mill & Land Co., 152 Mo. 145; Cook v. Smith, 200 Mo. App. 218; O'Toole v. Lowenstein, 177 Mo. App. 662;

Schwald v. Brunjes, 139 Mo. App. 516; Golden v. Moore, 126 Mo. App. 1. c. 522.] Title to, or a right of property in, a chattel will not alone support an action in conversion. It must be coupled with actual possession or a right of immediate possession. [Bank v. Tiger Tail Mill & Land Co., supra; O'Toole v. Lowenstein, supra; Schwald v. Brunjes, supra; 38 Cyc. 2045.]

In the case at bar, plaintiff, by its letter of May 27, 1915, addressed to the creditors' committee, which letter was ratified by plaintiff's board of directors, authorized such committee to "operate, manage and conduct" the Marquette restaurant, and to "sell the interest" of plaintiff therein "upon such terms as you see fit." The language used was unequivocal and far reaching. Coincident with, or shortly after, the delivery of such letter, plaintiff turned over to the committe the cash which it had on hand, the accounts owing to it, the stocks and bonds which it held, and apparently all other property owned by it. The committee subsequently rendered a statement to the officers and directors of plaintiff showing receipt of $10,274 from the National Bank of Commerce, $82 from the International Bank, $400 from the cash drawer at Faust's, $5,000 as the proceeds of sale of Faust's; $776 as surplus from the sale of Kinloch bonds, $250 interest on such bonds, and $717 from outstanding accounts, rebate on insurance, etc. The committee, acting through Wolfson, its secretary, proceeded to assume full management and control of the restaurant and bar at the Marquette and to operate the same, removing the manager and appointing a new manager, reducing salaries, purchasing supplies in its own name, collecting the receipts which came in, paying the bills which accrued, and in general exercising complete jurisdiction over the business. In line with the purpose for which it was appointed, the committee also managed the other affairs of plaintiff, liquidating the accounts of creditors, settling leases, handling litigation in which plaintiff was involved, renewing insurance, and perform-

ing practically every function which plaintiff could have performed. The reports made by the committee to the board of directors of plaintiff were but perfunctory, as no special directions were requested of the board nor were any given by it. The real parties for whose benefit the affairs of plaintiff were being administered were the creditors, who appointed the committee in the first instance and who at all times acquiesced in its management and accepted the fruits of its efforts. They were the primary beneficiaries.

The letter of May 27, 1915, coupled with the course of conduct of plaintiff and the creditors' committee subsequent to the execution and delivery thereof, therefore amounted substantially to an assignment or conveyance in trust for the benefit of creditors. Though no doubt not intended by plaintiff to operate as a statutory assignment, the instrument, as acted upon by all the parties concerned, and as amplified by the surrender by plaintiff of all of its other property, constituted in effect a practical, present appropriation of its assets for the benefit of its creditors. As said by BRACE, J., in Jaffrey v. Mathews, 120 Mo. l. c. 327, in speaking of the assignment statute (Sec. 623, R. S. 1919):

"There is nothing in the terms of the law itself; there is nothing in the history of the legislation on this subject; there is nothing in the adjudications of this court, that gives countenance to the idea that a debtor, insolvent or otherwise, who is desirous of appropriating his property to the payment of his debts is compelled to resort to the statutory proceeding to accomplish his purpose. . . . The statute does not, and was not intended, to any further extent, to abolish or abridge his common law right, whether solvent or insolvent, in good faith to sell, deliver in payment, mortgage or pledge the whole or any part of his property for the benefit of one or more of his creditors." To the same effect is the pronouncement in Brookshier v. Mutual Fire Insurance Co., 91 Mo. App. l. c. 605.

As laid down in 5 Corpus Juris. 1187; "By an assignment for the benefit of creditors, the assignee acquires all title, right and interest of the assignor, and as against the assignee and those holding under him, the debtor has no interest in the property, legal or equitable, which he can convey or encumber." As further said in Hargadine v. Henderson, 97 Mo. l. c. 385, an assignment for the benefit of creditors "is more than a security for the payment of debts; it is an absolute appropriation of property to their payment. It does not create a lien in favor of creditors upon property which in equity is still regarded as the assignor's, but *it passes both the legal and equitable title to the property absolutely beyond the control of the assignor.*" (Italics ours). But, as stated in the same case, "If a surplus remains in the hands of the trustee after the purposes of the trust have been discharged, it will go to the grantor, in whose favor a resulting trust for such excess will be implied." And so in the instant case, the surrender by plaintiff of its property was in effect a transfer to the creditors' committee as trustees for plaintiff's creditors, plaintiff becoming thereby divested of title to the property. If, after all claims were paid, any surplus remained, it was but proper that the committee should turn the same back to plaintiff. Such was evidently the intention of the parties.

Accordingly, with title vested in the creditors' committee, plaintiff was not entitled to possession of the property at the time of the alleged conversion. And, it being manifest that when the committee assumed charge of and began the operation of the Marquette branch, it acquired possession of the property, which possession was retained up until the time of the alleged conversion it cannot be urged that plaintiff was then in possession. It follows, therefore, under the authorities hereinbefore cited, that plaintiff could not maintain an action in trover.

As definitive of the superior rights of trustees under circumstances somewhat analogous to those before us, we find the case of Wright v. Euless, 12 Tex. Civ. App. 136, wherein the plaintiff company became insolvent, and, by action of its stockholders, placed its entire assets in the hands of the president and other directors as trustees, for distribution ratably among its several creditors. After a partial distribution had been made by these trustees among the creditors, one of the creditors caused the remaining assets to be attached. Upon suit brought by the trustees against the sheriff and the surety indemnitors, the court held that "as the corporation no longer had any interest in or possession of the property when it was levied on," the seizure was not authorized and the trustees were entitled to recover the full value of the property seized.

In Liebowitz v. Brinn, 113 N. Y. Supp, 685, where plaintiff's right to possession of the goods sued for was conditional on the settlement of his debts, and no settlement was effected as to defendants, it was held that he could not recover for conversion.

In Wittmor v. Hastings, 51 Mo. 171,. where a merchant being in failing circumstances, and being indebted to certain judgment creditors, turned over his merchandise to an agent to be sold and the proceeds to be divided pro-rata among the creditors, it was held that the goods were not subject to execution on behalf of one creditor to satisfy his individual claim.

In Calumet Paper Co. v. Haskell Show Printing Co., 144 Mo. 331, where defendant, being insolvent, executed a deed of assignment for the benefit of creditors to one Parker, and plaintiff, a creditor, sued defendant by attachment and summoned the assignee Parker as garnishee, claiming that the assignment was void, it was held that the property, "being a trust fund for the benefit of all the creditors and stockholders of the company, was not subject to garnishment."

The conclusion to be drawn from all of the foregoing is that, in the case under review, if a right of ac-

tion for conversion existed, such right arose in favor of the creditors' committee and not plaintiff. Clearly, therefore, the court should have given the instuctions in the nature of a demurrer to the evidence requested by defendants.

For failure to so do the judgment is reversed. All concur.