NEW FIRST NATIONAL BANK, a Corporation, S. O. POTTORFF, Receiver, Appellants, v. C. L. RHODES PRODUCE COMPANY, a Corporation. —58 S. W. (2d) 742.

Division One, February 18, 1933.

*Frank B. Williams* and *A. P. Stone, Jr.,* for appellants.

*W. D. Tatlow* for respondent.

ATWOOD, J.—This case was transferred by the Springfield Court of Appeals to the Supreme Court on the ground that the amount in dispute is in excess of $7500.00 thus bringing the appeal within the jurisdiction of the latter court. [37 S. W. (2d) 986, 225 Mo. App. 438.]

The original petition, filed in the circuit court of Greene County by the New First National Bank before it went into the hands of a receiver, was in two counts. The first count charged that on March 8, 1927, defendant C. L. Rhodes Produce Company, a corporation, deposited with plaintiff bank four checks of John W. Rhodes and Company, each in the sum of $2620.00, making a total deposit of $10,480.00; that the consideration of these checks was four cars of eggs, shipped from Springfield, Missouri, to Chicago, Illinois, in the name of C. L. Rhodes Produce Company on memorandum bills of lading, to which bank drafts were attached in excess of $10480.00; that before said bank drafts were collected defendant stopped delivery of the eggs and afterwards sold and disposed of them and appropriated the proceeds in the sum of $10,600.00 to its own use; that when said deposit of $10,480.00 was made on March 8, 1927, it was entered as a credit on defendant's account, and defendant thereafter drew checks against said account to the full amount thereof and on April 4, 1927, the account was closed; that all four checks so deposited were dishonored by the drawee bank for insufficient

funds, of which fact defendant was duly notified, and subsequently the drawer made two of them good but the remaining two checks were not made good. Judgment was prayed in the sum of $5240.00. The second count was for money had and received on March 9, 1927, in the sum of $5240.00, for which amount judgment was prayed.

Defendant's answer contained a general denial of the substantive allegations of plaintiff's petition and further pleaded: that on March 9, 1927, defendant was the owner of four cars of eggs which it conditionally sold to John W. Rhodes and Company; that in payment therefor John W. Rhodes and Company gave defendant four checks for $2620.00 each on plaintiff bank, and in order to meet said checks deposited four drafts with bills of lading attached in plaintiff bank and received credit therefor; that plaintiff knew said checks were given for the purchase price of said eggs; that after giving defendant credit on its account for all four of said checks plaintiff bank claimed the right to charge defendant's account with two of said checks amounting to $5240.00 unless said John W. Rhodes and Company would deposit with it the amount of an overdraft claimed to be $6500.00; that said $5240.00 was not in fact charged back to defendant's account, but said John W. Rhodes and Company in order to raise sufficient funds to pay the overdraft so claimed procured an accommodation note of J. A. Rhodes which was placed in plaintiff bank; that although John W. Rhodes and Company stopped payment of the aforesaid drafts so that the proceeds thereof could not be returned to plaintiff bank yet said company used said proceeds in payment of said overdrafts to plaintiff, and that "if the said bank had notified either the defendant or the said John W. Rhodes and Company that said checks had not been paid, it would have been the duty of John W. Rhodes and Company to have applied the proceeds of the said drafts to the payment of said checks, which the said John W. Rhodes and Company would have done." Defendant's answer further alleges that plaintiff "well knew or ought to have known that the four carloads of eggs belonged to the defendant, C. L. Rhodes Produce Company and not John W. Rhodes and Company, until they were paid for, and that the said four checks given to it, as aforesaid by the said John W. Rhodes and Company, were given in payment of the purchase price thereof, and with the understanding that the title to the said four cars of eggs should remain in C. L. Rhodes Produce Company until paid for, and that if the said checks were not paid, that the defendant would not in fact receive payment for its eggs, and hence the said plaintiff was at all times charged with knowledge of the fact that the proceeds received from the sale of said eggs in Chicago could not lawfully be used by the said John W. Rhodes and Company to pay any indebtedness or overdraft which the said bank claimed the said John W. Rhodes and Company then and there owed the plaintiff bank; and with full knowledge of this fact the plaintiff is seeking to unlawfully appro-

priate and convert to its own use the proceeds from the sale of defendant's eggs by claiming and asserting that the defendant is indebted to it to the amount of said checks. That to permit the plaintiff to recover on the said checks would enable it to appropriate the property of this defendant to the payment of the indebtedness which it claims that John W. Rhodes and Company owes it, and for which this defendant was not at any time obligated or responsible'' etc.

Thereafter, S. O. Pottorff was appointed receiver for plaintiff bank and on June 23, 1928, the court sustained a motion requiring the receiver to be joined as party plaintiff, and on the same day the case was by order of the court, referred to Hon. F. M. McDavid to hear and determine the issues and report thereon. Thereafter, on October 2, 1929, after the taking of the testimony by the referee, but before the filing of his report, plaintiffs, by leave of court and over the objections of defendant, filed an amended petition, the substantive part of which is as follows:

"For cause of action against defendant, plaintiff states that on the 8th day of March, 1927, the plaintiff was the legal and equitable owner of three certain car loads of eggs of the value of seven thousand nine hundred and fifty ($7,950.00) dollars and that defendant thereafter converted and appropriated said three carloads of eggs to its own use and sold the same for the sum of $7,950.00, and received the proceeds thereof, and that defendant is indebted to plaintiff for money had and received in the sum of $7,950.00, for which plaintiff prays judgment, together with interest thereon from the 8th day of March, 1927, at the rate of six per cent (6%) per annum, and for costs.''

On January 28, 1930, the referee filed his report finding the issues in favor of defendant and plaintiffs filed exceptions thereto. On February 7, 1930, defendant filed motion to strike out plaintiffs' amended petition and also for judgment on the referee's report. Thereafter, on April 26, 1930, the court sustained defendant's motion to strike out plaintiffs' amended petition, overruled plaintiffs' exceptions to the referee's report and rendered judgment against plaintiffs and in favor of defendant. Plaintiffs appealed and filed motion to have the appeal granted to the Supreme Court. This motion was overruled and the appeal was granted to the Springfield Court of Appeals and the cause subsequently transferred to this court as aforesaid.

Section 819, R. S. Mo. 1929 authorizes the court "at any time before final judgment, in furtherance of justice,'' to amend any pleading "by conforming the pleading or proceeding to the facts proved'' when the amendment does not change substantially the claim or defense. Plaintiffs' amended petition was evidently offered and permitted to be filed on this theory because such occurred after the taking of testimony before the referee. Some months later defend-

ant filed motion to strike out this amended pleading. A few months thereafter this motion was sustained on the grounds that it was a departure and did not conform to the facts proved, and at the same time the court rendered judgment for defendant. ▇ This amended petition complied with section 828, R. S. 1929 requiring such pleading to be complete within itself, and by filing it plaintiffs abandoned their original petition and all matters not restated in the amended petition. [Ross v. Mineral Land Co., 162 Mo. 317, 329, 62 S. W. 984; Beattie Mfg. Co. v. Gerardi, 166 Mo. 142, 153, 65 S. W. 1035; Arkla Lumber & Mfg. Co. v. Henry Quellmalz L. & Mfg. Co. (Mo. Sup.), 252 S. W. 961, 967.] When defendant's motion to strike was sustained plaintiffs stood on their right to bottom their case on this amended petition and failed to plead further. Issue having previously been joined by petition and answer the amended petition when filed simply took the place of the original petition which was thereby abandoned. So, the amount in dispute at the date of the judgment was $7,950.00, the amount claimed by plaintiffs in their amended petition which was the only petition then before the court. [State ex rel. v. Reynolds, 213 S. W. 804, 806, 278 Mo. 695; Wilson v. King's Lake Levee & Drainage Dist., 139 S. W. 136, 237 Mo. 39; Leslie v. Carter, 268 Mo. 420, 423, 187 S. W. 1196.] It follows that we have jurisdiction to determine the appeal.

It will not be necessary to set forth in this opinion all of the ramifications of the record because appellants' contentions necessarily proceed on the theory that the amended petition conforms to and is supported by the facts proved and that this pleading is not a departure. We shall first consider the amended petition in the light of the pertinent facts proved.

The evidence shows that on March 8, 1927, defendant corporation sold four cars of eggs to John W. Rhodes, doing business under the name of John W. Rhodes and Company, in full payment of which the latter delivered to defendant four checks drawn on plaintiff bank for $2620.00 each and received in exchange therefor four uniform straight bills of lading covering the four cars of eggs. In three of these bills of lading defendant was named as shipper and John W. Rhodes was named as consignee, all three shipments moving from Springfield, Missouri, to Chicago, Illinois. The fourth car was consigned by Conway Produce Company, Conway, Missouri, to defendant at Chicago, Illinois, and the bill of lading duly endorsed by defendant. On the same day John W. Rhodes drew four drafts upon dealers in Chicago for $2650.00 each, each draft including $30.00 broker's commission, attached one to each of said bills of lading and deposited all four drafts, with the bills of lading duly endorsed on the back by John W. Rhodes and Company and attached, in plaintiff bank. The evidence further shows that plaintiff bank received the proceeds of one of these drafts in the regular course of

collection, but the other three drafts, covering cars M. D. T. 156078, P. F. E. 18725 and N. P. 94872, were protested on March 14, 1927 and returned to plaintiff bank unpaid, and plaintiffs' amended petition alleges that these three cars of eggs were converted by defendant to its own use.

It further appears from the record that the aforesaid drafts and bills of lading attached were deposited in plaintiff bank late in the afternoon of March 8th, as were also the four checks for $2620.00 each given by John W. Rhodes to defendant. The former were included in a credit entry of $13728.62 made March 8, 1927 on John W. Rhodes and Company's account at plaintiff bank, and the latter were entered March 9, 1927, as a credit on defendant's account at plaintiff bank. It further appears that despite John W. Rhodes and Company's balance of $1700.46, shown on March 7, 1927, and its deposit of said drafts with bills of lading attached and other items aggregating $13728.62 made March 8, 1927, plaintiff bank held as cash items John W. Rhodes' said four checks given to defendant in payment of said four cars of eggs while on March 8th and 9th it charged three other checks aggregating $14479.26, so that on March 9, 1927, the credit created by deposit of the four drafts with bills of lading attached had been exhausted and the account of John W. Rhodes and Company overdrawn to the extent of $949.82 although none of the checks given in payment of the four cars of eggs had been charged to the account of the drawer. This suit, as it will further appear, grows out of plaintiff bank's insistence upon retaining the benefit of the credit thus diverted from payment of these purchase money checks to payment of other checks drawn by John W. Rhodes and Company.

Notwithstanding plaintiff bank had credited defendant's account with the aforesaid four checks of John W. Rhodes and Company aggregating $10480.00, plaintiff bank's vice-president, either the day this deposit was made or the next day, called James A. Rhodes, who was defendant's manager and in charge of its business, and told him that these checks were not good because there were no funds to pay them. James A. Rhodes testified that he replied: ''I don't owe you nothing, those eggs are mine until they are paid for''. It further appears that after this conversation and on the same day plaintiff bank's president called John W. Rhodes, told him that his account was overdrawn, asked him to ''make the usual necessary arrangements'', and suggested that he get his brother James A. Rhodes to make the bank a note for $6500.00 for the benefit of his account. It further appears from the evidence that the bank's officers in charge of its business knew that the eggs in question were purchased by John W. Rhodes and Company from defendant and that the checks which were deposited in the bank simultaneously with the drafts and bills of lading attached were for the purchase price of these eggs,

and defendant was within its rights in replying as it did through its manager to the bank. The bank's obvious purpose in these conversations with James A. and John W. Rhodes was to utilize the situation to obtain more assets to the credit of John W. Rhodes who, independent of this transaction, was heavily indebted to the bank.

John W. Rhodes immediately advised James A. Rhodes of the bank's request and the latter, on March 9, 1927, gave his personal note for $6500.00 which John W. Rhodes promptly delivered to the bank. This amount was credited to the account of John W. Rhodes and Company on March 10, 1927. John W. Rhodes testified that when the bank's president asked him to get this note he told him that the bank was out of money and couldn't go any further, and after he had delivered the note to the bank he called up the Chicago dealers upon whom the drafts here in question had been drawn and requested them to refuse payment, which they did. It further appears that on March 10, 1927, he had defendant's book-keeper draw new drafts against the same dealers through The McDaniel National Bank, Springfield, Missouri, for the same amounts. John W. Rhodes testified that on account of his information as to the bank's weakened condition he adopted this course in order to protect all parties to the transaction, and did not tell James A. Rhodes that he had stopped payment on drafts drawn through plaintiff bank until after he had done so. The drafts were handled by defendant for the partnership account of John W. Rhodes & T. W. Hackworth, and when the proceeds were received about March 16, 1927, James A. Rhodes applied $6500.00 of this amount to payment of his personal note which had been credited to the account of John W. Rhodes on March 10, 1927, by giving defendant's check to plaintiff bank drawn on The McDaniel National Bank in that amount. When credit of $6500.00 was given to the account of John W. Rhodes and Company March 10, 1927 on account of this note the bank charged two of the four checks given for the purchase price of the eggs to the account of John W. Rhodes and Company and continued to carry the remaining two checks as cash items and continued to hold the three dishonored drafts with bills of lading attached, although after March 9, 1927, defendant had no intimation that all checks had not been paid or that the bank had aught against it. It thus appears that by March 16, 1927, plaintiff bank had received the full proceeds of drafts for one of the four cars of eggs and $6500.00 of the proceeds arising from the sale of the remaining three cars. The latter amount was received in liquidation of a note given, according to some of the evidence, for the purpose of permitting all four of the purchase price checks to clear. However this may be, the bank permitted only two of these checks to be cleared out of all these proceeds and continued to hold the three dishonored drafts, although none of these checks were ever actually charged

back to defendant and there is substantial evidence that the bank advised defendant that all of the checks were paid.

The bank, however, continued to press its claims against John W. Rhodes for the dishonored drafts and after obtaining a loan from another source on his residence property he deposited $5827.85 to the credit of John W. Rhodes and Company on March 28, 1927, at which time the bank's cashier suggested that he take up these drafts, amounting with protest fees to the sum of $7957.74. He said that he would do so if the balance in his account was sufficient. The bank's cashier assured him that his balance was sufficient and thereupon he gave check of John W. Rhodes and Company to plaintiff bank for $7957.74. Plaintiff bank's deposit ledger sheet of the John W. Rhodes and Company account, which was introduced in evidence, shows that this check was charged against this account and cleared on March 28, 1927, leaving a balance of $11.31 in the account at the close of that day. The bank's cashier testified that "the bank got $7957.74 out of his account for those three drafts I turned over. At the time I turned over the drafts, I turned over these bills of lading". The cashier further testified that after John W. Rhodes delivered the above mentioned check to the bank he permitted Rhodes to take the drafts and bills of lading to the office with the understanding that he would later bring them back, which he failed to do. Rhodes stoutly denied that there was any such conditional delivery and there appears to be no reason why he should have entered into any such agreement.

While the bills of lading attached to the drafts deposited with plaintiff bank bore the endorsement of John W. Rhodes and Company, the bank was fully advised that the four checks deposited with the bank by defendant were given for the purchase of the eggs represented by the drafts and bills of lading attached, and it had no right to disclaim liability for the payment of these checks and at the same time claim absolute title to the eggs. There is no evidence that defendant caused the drafts to be dishonored or appropriated the proceeds of the sale of the eggs to its own use, although with the bank's intimation that the checks given it for the purchase price of the eggs would not be paid it might have taken such steps to protect its interest therein without being guilty of conversion or any wrongdoing.

Counsel for appellants insist that the bank received no benefit from the check for $7957.54 given by John W. Rhodes and Company and accepted and paid through this account on March 28, 1927, in exchange for the dishonored drafts with bills of lading attached, because the account of John W. Rhodes and Company was still credited with the amount of the three dishonored drafts. There is no merit in this claim as far as defendant is concerned in view of the fact that the bank had already received $6500.00 of the proceeds of the sale of the three cars of eggs originally represented by these three

drafts and bills of lading attached. The record plainly shows that on March 28, 1927, John W. Rhodes deposited $5827.25 obtained from an independent source. He, and not the bank, had the right to apply this together with any balance in his current account to the payment of such indebtedness as he chose and the evidence is clear that he elected to apply and did apply it to the payment of the three dishonored drafts. In the face of this election the bank had no right to apply any part of it to the payment of the two checks held as cash items or other indebtedness due the bank from John W. Rhodes and Company.

 It seems clear from the foregoing that the court did not err in sustaining defendant's motion to strike out plaintiff's amended petition on the ground that it did not conform to the proof. Even if it could be said that the evidence made out a case in conversion, which we do not concede, plaintiff's amended petition would not conform to the facts proved because in order to maintain an action for conversion it is necessary for the party aggrieved to plead and prove his possession or right to possession of the property at the time of the alleged conversion, (Coal & Mining Co. v. Fuel Co., 310 Mo. 158, 169, 170, 274 S. W. 774; Catering Co. v. Glancy, 294 Mo. 438, 456, 457, 242 S. W. 392; Bank v. Tiger Tail Mill & Land Co., 152 Mo. 145, 156, 157, 53 S. W. 902), and such was not pleaded. Recovery under the amended petition was sought solely on the theory of conversion and since it did not contain this essential allegation the amended petition was properly stricken out. Upon plaintiff's failure to plead further the court could not do otherwise than find for defendant. Had plaintiff in his amended petition stated and relied solely upon an action for money had and received the result would have been the same because the referee found that plaintiff received $7957.74 from John W. Rhodes to take up the three drafts in question, and there was substantial evidence, as above indicated, to support this finding.

For the reasons hereinabove stated the judgment is affirmed. All concur.