**NATIONAL SURETY CORPORATION, a Corporation (Plaintiff), Respondent,**

v.

**Bernard F. HOCHMAN (Defendant), Appellant.**

**No. 29917.**

St. Louis Court of Appeals.

Missouri.

June 3, 1958.

Motion for Rehearing or to Transfer to Supreme Court Denied July 1, 1958.

Jerome F. Duggan, Sidney W. Horwitz, St. Louis, Dubinsky & Duggan, St. Louis, of counsel, for appellant.

Wayne B. Wright, Henry C. Bryan, Jr., St. Louis, McDonald & Wright, St. Louis, of counsel, for respondent.

HOUSER, Commissioner.

This is a subrogation suit by National Surety Corporation (the surety) to recover from Bernard F. Hochman (the customer) the sum paid by the surety to Merrill Lynch, Pierce, Fenner & Beane (a firm of stock brokers, the named insured in a Wrongful Detention of Securities Policy issued by the surety), based upon an alleged wrongful conversion by the customer of certain corporate stock delivered by mistake by the brokers to the customer. Judgment for the surety for $1,312.50 was entered upon a jury verdict. The customer has appealed.

The surety's petition alleged that the customer placed an order with the brokers to purchase for him 300 shares of *1¢* par value stock of Federal Uranium Corporation at the prevailing market price; that the brokers executed the order; that by clerical error the brokers caused to be issued and delivered to the customer in his name 300 shares of *25¢* par value stock of that company of the market value of $1,340.64 at the time of delivery and demand; that the brokers demanded endorsement and return of the certificate mistakenly delivered and demanded that the customer accept delivery of the 1¢ par value stock to which he was entitled, but that the customer refused and wrongfully retained the certificate for the 25¢ par value stock and converted it to his own use. The existence of the policy indemnifying the brokers for loss by reason of wrongful delivery or retention of securities, reimbursement by the surety of the brokers for their loss and the surety's subrogation rights under the policy were alleged. The surety prayed for damages in the sum of $1,340.64, and interest, for wrongful retention and conversion.

The customer's answer alleged that he was advised by letter from the brokers that they were trading in only one type of Federal Uranium Corporation stock; that the customer ordered 300 shares of "the stock aforesaid;" that the purchase order was confirmed; that the customer was billed for the purchase; that he paid the bill in full and received 300 shares of "the aforementioned stock" from the brokers, and prayed that the petition be dismissed.

The evidence favorable to the prevailing party: During 1954 the brokers, for the account of the customer, bought and sold several hundred shares of Federal Uranium Corporation, a 1¢ per share par value stock. (Hereafter the corporation will be referred to as "Uranium".) In December, 1954 the board of directors voted to reclassify Uranium stock by way of a "reverse split" or "split-down" under which all old 1¢ par value stock was to be called in and new 25¢ par value stock was to be issued therefor in the ratio of 1 to 25. On

January 18, 1955, the brokers mailed a letter to those clients for whom they held Uranium notifying them that in view of the split-down they were arranging to exchange the stock so held. The letter stated that the "old" stock was no longer transferable and had been suspended from dealings. As a matter of fact, however, both the old 1¢ par value and the new 25¢ par value issues of Uranium were traded as late as April 20, 1955. In February, 1955 Uranium notified all stockholders that the reclassification of stock had been approved and that they could send in their old shares and exchange them for 1⁄25 as many new shares. On February 9, 1955, the customer telephoned the brokers, talked to S, one of their executives, and asked the price of Uranium. S looked up the price in National Quotation Sheets. The only offering price he found listed was 21¢ per share. He testified that "not to his knowledge" was there more than one class of stock listed on the sheet. He informed the customer that the market price on Uranium was 21¢ per share, whereupon the customer told S to buy 300 shares at 21¢. On February 9 300 shares of the 1¢ stock were worth $63 and 300 shares of the 25¢ stock were worth approximately $1,500. On February 9 the New York office of the brokers purchased 300 shares of Uranium at 21¢ for the account of the customer. Later in the day A, another executive in the office of the brokers, telephoned the customer, informing him that the brokers had a confirmation by wire that the 300 shares of Uranium had been purchased for him at 21¢. The customer then discussed with A the reverse split in Uranium and said he was buying the additional 300 shares to put with 200 shares of 1¢ par value stock he already owned, so that on the exchange he would "wind up" with 20 shares of 25¢ par value stock. On the same day the brokers by mail sent the customer a confirmation notice that the customer had bought 300 shares of Uranium *of the par value of 25¢*, at a price of 21¢ per share, with commission and postage charges of $3.93, and that the net amount due totalled $66.93. On February 10 the customer informed A by telephone that he had received the bill for the transaction but that it was incorrect; that it referred to 25¢ par value whereas the customer had ordered 1¢ par value stock. A inquired into the matter and found that the customer was right—that a billing mistake had been made. A told the customer that a corrected bill would be given him. Later a corrected bill was sent. On February 10, 1955, the customer issued his personal check payable to the brokers for $66.93 which was endorsed by the brokers and paid on February 15, 1955. On February 10 or 11 the customer came into the brokers' office and delivered to A a certificate for the 200 shares of Uranium he already owned and asked that it be combined with the 300 bought February 9. The St. Louis office of the brokers then undertook to cancel the original instructions to the brokers' New York office to issue a certificate for 300 shares, and issued new instructions to hold the 300 and combined them with the 200 shares. About three weeks after February 9, 1955, the customer telephoned A that he had received from the New York office a certificate for 300 shares 25¢ par value Uranium and asked what should be done. The New York office, by mistake, had issued 25¢ par value stock to the customer instead of 1¢ par value stock. A stated that it would have to be returned. The customer indicated that he would "bring the stock back," but he failed to return the certificate for 300 shares of Uranium, 25¢ par value. A called him two or three times requesting its return. The customer repeatedly promised to return the stock, but did not do so. Around March 23, 1955, the customer, in a telephone conversation with the resident partner of the brokers, stated that he would consult with his lawyer, and again promised to return the stock to the brokers. Thereafter A conferred with the customer's lawyer, showed him the quotation sheets, pointed out that there were two classes of stock

and discussed the errors of billing and delivering 25¢ instead of 1¢ stock. The customer's lawyer answered that A's explanation "most certainly would not" clear up the matter. The customer thereafter was notified that if the stock was not returned the brokers would buy in an equivalent number of shares for the account and risk of the customer. Pursuant to this notice and not upon order by the customer the brokers on May 23, 1955, bought for the customer's account 300 shares of 25¢ par value Uranium at a cost of $1,312.50. The 300 shares of Uranium 25¢ par value which the brokers had delivered to the customer were owed to other customers. The brokers were obliged to go into the market and replace those shares by the purchase of an equivalent number of shares because the brokers were short 300 shares in their Uranium account. The market price of Uranium on May 23, 1955, as reflected by the National Daily Quotation Service ranged from 4½ to 4⅝ but the brokers bought this particular lot at 4⅜. On the same day the brokers sent the customer a confirmation form showing the purchase for his account of 300 Uranium par value 25¢, a charge of $28.14 for commissions, and a net total amount due of $1,340.64.

In accordance with the customer's instructions and in February or March, 1955 the 300 shares of 1¢ par value stock bought on February 9 were combined with the 200 previously owned by the customer and converted into a certificate for 20 shares of Uranium 25¢ par value, which was held in the customer's account and later, on October 29, 1956, delivered to the customer's attorney, duly endorsed by the brokers so that it could be transferred into the name of the customer on the books of Uranium.

The brokers called the customer to the stand as a witness. He testified that he told S that he wanted to order 300 shares of Uranium; that he had placed his order for Uranium stock at 21¢ a share. (The testimony as to price was stricken out on motion.) He admitted that he had received 300 shares of 25¢ par value stock from the brokers and that he had delivered to the brokers 200 shares of 1¢ par value stock with instructions to convert it into 25¢ par value stock. On cross-examination by his own counsel the customer testified that he knew "of his own knowledge" that there was only one Uranium stock (the 25¢ par value stock after reorganization) being offered for sale on February 9, 1955.

On this appeal the customer raises three points:

(1) Error in overruling the customer's motion to dismiss the petition for failure to state facts sufficient to state a cause of action in conversion. Citing New First National Bank v. C. L. Rhodes Produce Co., 332 Mo. 163, 58 S.W.2d 742, and Welch v. Diehl's Estate, Mo.App., 278 S.W. 1057, customer-appellant urges that the petition fails to allege the essential fact that plaintiff was the owner of, or had a property right in, or had the possession or was entitled to the immediate possession of the stock at the time of the conversion. While it is true that the aforesaid allegations must be made in order to state a claim upon which relief can be granted for conversion of personal property, no particular words of art must be employed—there is no magic verbal formula by which these facts must be alleged. It is sufficient if the petition states facts from which it can be inferred, as a matter of law, that plaintiff had possession or right to possession at the time the property was converted. Cammann v. Edwards, 340 Mo. 1, 100 S.W. 2d 846; Hussey v. Ellerman, Mo.App., 215 S.W.2d 38. In Wilkinson v. Misner, 158 Mo.App. 551, 138 S.W. 931, an action in the nature of trover as for conversion brought by a pledgee of certain corporate stock, this court held that a pleading is sufficient if the right of possession at the time of the conversion is necessarily to be implied or reasonably may be inferred from other pertinent allegations in the petition. From allegations that the customer ordered 1¢ stock and by mistake the brokers filled

the order by delivering 25¢ stock, which the customer upon demand wrongfully retained and refused to return, it is necessarily to be implied and reasonably may be inferred, as a legal proposition, that the customer converted stock which did not belong to him, stock which previously had been in the lawful possession of the brokers and to which the brokers had the right of immediate possession at the time of the conversion. On the right of the brokers in equity to recover the possession of the stock in such case see Newburger v. Weaver, 300 Pa. 163, 150 A. 298; 12 C.J.S. Brokers § 30, p. 78. The first point is ruled against the customer-appellant.

■ (2) Error in overruling the customer's motion for a directed verdict for failure of plaintiff to make a submissible case.

It is first urged that the surety's evidence is speculative and conjectural; that the testimony of its witnesses as to the ultimate facts was in direct contradiction. A particular criticism is that witness S testified unequivocally that there was only one type of Uranium stock being offered for sale on February 9, whereas witness A testified that there were two. The criticism is wholly unfounded. S testified that the only offering price he found listed in the National Quotation Sheets was 21¢ but he did not exclude the possibility that another class of stock may have been offered for sale at a different price in other lists or in other markets.

Complaint is made that the surety did not produce certain additional available documentary evidence to show the sales price of Uranium on February 9. That fact does not render speculative or conjectural the competent evidence thereof which was introduced.

A discrepancy as to the time when the 300 shares and the 200 shares were combined into 20 shares, as testified to by A and as evidenced by the date of issue appearing on the combined certificate, is criticized.

This was a question of credibility which was resolved by the verdict of the jury.

■ Customer-appellant says that A testified that from May 27, 1955 to October 29, 1956 the customer was indebted to the brokers in the sum of $1,340.64 as shown by the statement of account rendered to the customer on May 27, 1955; that this indicates that the brokers took the position that the customer was indebted to them on an account; that if the customer was indebted on an account the theory of the brokers must have been that title to the stock had passed to the customer, in which event there could not possibly have been a conversion. The record does not support this conclusion. A denied that the customer was still indebted to the brokers as of October, 1956. A, interpreting the statement of account, testified that it shows (1) a cash balance of $1,340.64 carried against defendant on May 27, 1955, which was cleared by the payment by the surety of that sum to the brokers on June 23, 1955, as reimbursement for its loss and (2) a stock balance showing the customer to be "long" 20 shares of 25¢ par value Uranium, which was cleared by the delivery of the stock to the customer's attorney on October 29, 1956. The statement of account rendered May 27, 1955, was not the statement of an indebtedness for the purchase price of the 300 shares of 25¢ par value stock mistakenly delivered to the customer. It was a statement charging the customer for the cost of *replacing* that stock. In effect, it was a bill for the damages sustained by the brokers. A's testimony and the statement of account were both wholly consistent with the surety's theory of conversion.

■ Citing Osborn v. Chandeysson Elec. Co., Mo.Sup., 248 S.W.2d 657, and Jackson v. Rothschild, Mo.App., 99 S.W.2d 859, for the proposition that to maintain trover plaintiff must have title or right to immediate possession and that there must be an invasion of a legal and not merely of an equitable right, customer-appellant argues that the surety's evidence failed to

prove that the brokers had title to, a property right in or right to the immediate possession of the stock at the time of the alleged conversion; that the evidence of ownership was vague and incapable of supporting an inference that the stock belonged to the brokers or to another customer; that in any event the right of the brokers was not a legal right but at best an equitable right, which is insufficient upon which to found an action in conversion. The argument is untenable. A bailee's right to the immediate possession of property is sufficient to support an action of trover. In Kalinowski v. M. A. Newhouse & Son, Mo.App., 53 S.W.2d 1094, we held that a gratuitous bailee had a sufficient interest to maintain the action. And see 6 Am.Jur., Bailment, § 302; 53 Am.Jur., Trover and Conversion, § 67; 8 C.J.S. Bailments § 56(b). The brokers' right to *immediate possession* of the stock as bailee was shown by substantial evidence. The brokers held the stock "in street name" for the account of various clients who did not wish to take delivery of stock purchased and desired to have the brokers act as a banker. The brokers held the stock for such customers "like the bank does." It was necessary to maintain in that account a sufficient number of shares for the brokers to make delivery to their various clients upon demand. When stock was withdrawn from that account it was "short" to the extent of the withdrawal. In such case the stock had to be replaced by "covering" to that extent. Instead of transmitting to the customer the 1¢ par value stock bought for him on February 9 the brokers by mistake caused to be issued and transmitted to him 25¢ par value stock which they were holding for others and to which, under the surety's theory, the customer had no right, title or interest. The brokers, as holders of that stock for others, had a right to the possession thereof as against all others except the true owner. Their right to the possession of such stock, placed by mistake in the hands of another than the true owner, was a legal right and not merely an

equitable right; it was immediate, unconditional and altogether a sufficient interest upon which to maintain an action for conversion.

Next, the customer asserts that the evidence fails to show the market value of Uranium at the date of conversion alleged in the petition (March 7, 1955) and that the court erred in admitting in evidence Exhibit D showing the value of Uranium on May 23, 1955, 2½ months later than the date of conversion alleged in the petition. The measure of damages for the conversion of shares of stock is their market value at the time of conversion. Brinkerhoff-Farris Trust & Savings Co. v. Home Lumber Co., 118 Mo. 447, 24 S.W. 129; Roll v. Fidelity Nat. Bank & Trust Co. of Kansas City, Mo.App., 115 S.W.2d 148. When did the conversion occur in this case? The petition alleged March 7, 1955. At the trial and on this appeal it has been the surety's theory that a conversion was proved by the customer's course of conduct between February 9 and May 23, 1955, during which period the customer at first acquiesced in the demand for the return of the stock, promised repeatedly to return it, later employed lawyers to look into the matter and finally, by the lawyers' rejection of the brokers' explanations and by the customer's inaction, exhibited an intention to claim the stock as his own; that the conversion occurred on May 23 and that the proper measure of damages was the market price on that day. A variance between allegation and proof as to the time of a conversion is immaterial where the conversion is shown to have occurred before the filing of the petition (August 19, 1955), 89 C.J.S. Trover and Conversion § 115, and where, as here, the evidence of conversion at a date subsequent to the date alleged in the petition was admitted without objection. Robinson v. Kansas City Public Service Co., 345 Mo. 764, 137 S.W.2d 548. We approve and affirm the surety's trial and appellate theory as to the time when the conversion occurred. This is not the case of

an absolute and positive refusal to comply with a demand for the return of property. The customer did not initially refuse but on the contrary promised to comply with the demand, not only once but repeatedly. He failed to keep his promises and did not deliver, but a mere failure to deliver when demand is made is not equivalent to a refusal. A sufficient refusal is made out in such case, however, when there is such continued evasion or delay that it finally becomes apparent that the defendant does not intend to comply with the demand or keep his promises to return the property. 89 C.J.S. Trover and Conversion § 59; 65 C.J. Trover and Conversion § 74. Under the evidence the jury could, and under Instruction No. 1 did, find that by his course of conduct up to May 23 the customer manifested an intent to and finally did convert the stock in question, and that the conversion occurred on May 23. The variance was immaterial and the exhibit was admissible.

■ The customer further assails the payment by the surety to the brokers under the indemnity policy as the act of a volunteer, and seeks protection under the rule that a surety who voluntarily pays a debt for which he is not legally liable is not entitled to subrogation. The insuring clause covered "Any loss of Securities occasioned by the voluntary delivery thereof to any person * * * not lawfully entitled to receive and retain them * * *." The policy contained the following exclusion: "(c) any loss * * * due to non-payment of any amount due or to become due for or on account of Securities delivered and retained as aforesaid." Pointing to the exclusion the customer argues that he was charged $1,340.64 on an account owed by him to the brokers and that under the very terms of the exclusion the surety was not legally liable to pay. The argument is fallacious. The brokers did not, at or near the time of the mistaken delivery of the stock, charge the customer's account with the then market value of 300 shares of 25¢

par value stock (which would have indicated the existence of a debt for securities delivered) but billed the customer on May 23, 1955, for the cost of the replacement of that stock. In other words, the brokers did not bill the customer for the sale and delivery of the original stock, but for the amount of the damages they later sustained. In the meantime the brokers pursued the customer, not on any supposed obligation for payment of the value of securities mistakenly delivered but solely on his obligation to return the securities themselves. The policy clearly covered this loss and there is no merit in this contention.

■ (3) Error in giving verdict-directing Instructions Nos. 1 and 2. The customer contends that the instructions failed to require the jury to find that the brokers on the date of the alleged conversion were entitled to the immediate possession of the stock. No. 1 submitted these facts: That the customer ordered Uranium stock at 21¢ per share; that there were two kinds of Uranium stock outstanding and being traded: 1¢ and 25¢ par value stock; that the parties understood the order to be for 1¢ par value stock; that the brokers bought 1¢ par value stock for 21¢ per share, which was its market value at that time; that the brokers later delivered to the customer a certificate for 25¢ par value stock. No. 1 then directed that upon finding those facts the brokers were *"then lawfully entitled to the return of the certificate delivered to defendant,* and if you find that thereafter * * * (the customer) by his course of conduct up to May 23, 1955, indicated that he was claiming a right to keep the stock certificate and would not return it, * * * (the brokers were) then entitled to recover from * * * (the customer) the fair market value the stock had at that time." (Italics and parentheses supplied.) By No. 2 the jury was instructed that the surety had succeeded to whatever claim the brokers had against the customer and if the jury found that the brokers were entitled to

recover from the customer the fair market value of the stock the surety was entitled to recover the same amount but not, however, more than $1,312.50, plus interest. Upon a finding of the facts hypothesized the right to possession referred to in No. 1 and the right to subrogation referred to in No. 2 followed as a matter of law. Under those findings of fact it was not necessary to submit to the jury the law questions of the right to possession or the right to subrogation.

There is no error in this record. Accordingly, the Commissioner recommends that the judgment be affirmed.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

Accordingly, the judgment of the circuit court is affirmed.

RUDDY, P. J., ANDERSON, J., and JAMES D. CLEMENS, Special Judge, concur.