FIREMAN'S FUND INSURANCE COM-
PANY, Plaintiff-Respondent,

v.

Ardin E. TRIPPE, Defendant-Appellant.

No. 32277.

St. Louis Court of Appeals.

Missouri.

April 19, 1966.

Starkloff & Joseph, by Carl E. Starkloff, Clayton, for appellant.

McDonald, Wright & Bryan, by Anthony F. Vaiana, St. Louis, for respondent.

CLEMENS, Commissioner.

This is an action in conversion to recover damages suffered by a brokerage firm when it sent the wrong stock certificates to the defendant and he sold the stock before the broker learned of its mistake. The plaintiff got a $10,000 verdict and judgment, and the defendant has appealed.

The decisive issue: Where the defendant ordered a low-priced stock from his broker, who by mistake mailed him a higher priced stock which the defendant then sold, may the broker recover its damages upon showing circumstantially that defendant knew the stock he received was not the stock he had ordered?

The defendant questions the sufficiency of the evidence, so we will relate the evidence that was favorable to the plaintiff. We will first identify the parties and the securities involved. The defendant was a 31-year-old electrical engineer who developed a sudden interest in the stock market. His dealings began with the St. Louis office of the New York brokerage firm of Merrill Lynch, Pierce, Fenner & Smith, whom we will speak of as "the broker." The plaintiff insurance company had insured the broker against loss from any "wrongful detention of securities"; and after the transactions herein involved, the plaintiff paid the broker's $11,250 claim and was subrogated to the broker's rights. We are concerned here with the stocks of two corporations with similar names. The first is American Investors Corporation, a Tennessee corporation. Its stock is not listed on any stock exchange and is sold only by "over-the-counter" sales; the market value was under $2 per share. The other corporation is American Investment Company, of Illinois. Its stock is actively traded on the New York Stock Exchange, and the market value was over $20 per share.

The dealings between Mr. Trippe and the broker began on February 21, 1961. He went to the broker's office and asked its "customer's man," Clarence Spiegelhalter, about several stocks, including American Investors Corporation which Mr. Trippe knew was an unlisted, over-the-counter stock. Mr. Spiegelhalter explained that he would have to inquire about the price, and shortly thereafter told Mr. Trippe that the "pink sheets" showed the stock was selling for $1.75 a share. Mr. Trippe ordered 500 shares. Mr. Spiegelhalter then entered an order with the broker's New York office to buy the stock, and 500 shares were bought for Mr. Trippe at the even lower price of $1.50 a share. The broker billed Mr. Trippe for $780.15, which was promptly paid. Next, on March 7, Mr. Trippe asked Mr. Spiegelhalter to place a sell order for his American Investors stock at $2.25, and Mr. Spiegelhalter placed that order. However, the stock did not reach that price, and on March 16 Mr. Trippe canceled the sell order. From the very first, each transac-

tion was confirmed by the broker's written memoranda and monthly statements, promptly mailed to Mr. Trippe. Mr. Trippe said that each memorandum bore a designation which jibed with his original order of American Investors, the low-priced stock.

In the meantime, Mr. Trippe's original purchase order had reached the broker's stock certificate department in New York. There, the appropriate stock certificates had to be withdrawn from a vault, endorsed by the broker, sent to the proper transfer agent, reissued in the purchaser's name, and mailed to the purchaser. This procedure takes at least two weeks. During this process the trouble began. The broker's stock certificate clerk got Mr. Trippe's purchase order for American Investors stock, but by mistake he picked out stock certificates of American Investment, the higher priced stock. These certificates were duly processed, and on March 6 Mr. Trippe received them by mail. It appears that Mr. Trippe did not then notice the mistake because on the next day, March 7, he asked Mr. Spiegelhalter to try to sell American Investors at $2.25. But on March 16 Mr. Trippe canceled that sell order. Then, on March 18, Mr. Trippe went to see another brokerage firm, Reinholdt & Gardner, and there he learned that the American Investment stock he had received was worth over $20 a share. Mr. Trippe began to sell. On March 21 he sold 100 shares of the American Investment stock through Reinholdt & Gardner for $21.87 a share, and on April 4 he sold another 100 shares at $22.25 a share. That left 300 shares of American Investment stock, and on April 10 Mr. Trippe sold these through still another broker, Edward D. Jones & Co., for $22 a share. For a novice Mr. Trippe had done well on the stock market. In seven weeks his $780 investment had spiraled to $11,000.

Meanwhile, the broker remained unaware of its mistake. But early in May the broker was called upon to deliver the 500 shares of American Investment stock that it had previously been holding for a customer. The broker then discovered that this stock was missing, but that it still had on hand the 500 shares of American Investors stock which Mr. Trippe had bought in February. Mr. Spiegelhalter phoned Mr. Trippe and asked him to examine his safe deposit box to see which stock certificates he had received. Mr. Trippe promised to do so, even though he had already sold the stock through other brokers. A week later Mr. Spiegelhalter again called Mr. Trippe, who first gave the excuse that he had not had a chance to inspect the certificates but then admitted that he had already sold the American Investment stock. Only then did the broker become aware of its impending damage.

Because the broker had by mistake sent Mr. Trippe another customer's stock certificates, that stock had to be replaced by the broker. So, on June 23 the broker wired Mr. Trippe, demanding that he send it 500 shares of American Investment stock or its equivalent in money; that if he failed to do so within five days, it would buy that stock at the market price so that the stock could be delivered to its rightful owner. Mr. Trippe did nothing, so the broker bought 500 shares of American Investment stock at a cost of $11,397.50. The broker still held the original 500 shares of American Investors stock that Mr. Trippe had ordered; and after notice to him it sold those shares for $594.76, thereby reducing its loss to $10,802.74. The plaintiff-insurer paid this amount to the broker, thus becoming subrogated to the broker's rights. Suit was filed; trial, verdict, judgment and appeal followed apace.

At the threshold of our review of the points raised by defendant's brief, we are met by the remarkably parallel case of National Surety Corp. v. Hochman, Mo.App., 313 S.W.2d 776, written for this court by Judge Houser. Because it applies broadly

here, we will relate the facts and law of the Hochman case at some length. There, as here, the stock broker's insurer-subrogee sued the broker's customer, Hochman, to recover the amount of the broker's loss occasioned by delivering the wrong stock certificates to Hochman. He had ordered 300 shares of a company's old 1¢-par-value stock, but by mistake the broker sent him 300 shares of the company's new 25¢-par-value stock. The broker billed Hochman, who paid for the 1¢ stock knowing he had received the 25¢ stock. Soon the broker discovered its mistake and demanded that Hochman return the misdelivered stock. When he failed to return the new 25¢ stock in exchange for the old 1¢ stock, the broker bought stock to replace the certificates mistakenly sent to Hochman. Later, the broker billed Hochman for its loss and made claim to the plaintiff-insurer. The insurer paid the claim, and as subrogee sued Hochman in conversion. Verdict and judgment were for the broker. Note that this Hochman case differs from ours in only two, noncritical ways: There, the defendant admitted his knowledge of the broker's mistake; here, that knowledge may be inferred from the defendant's conduct. There, the defendant's act of conversion was his refusal to return the stock to the broker; here, it was the defendant's sale of the stock.

In affirming the plaintiff's judgment, the Hochman case ruled four decisive issues. (1) Neither the petition nor the plaintiff's verdict-directing instruction need state that plaintiff had the right to possession; it was sufficient to state facts from which the right to possession, a legal conclusion, could be inferred. We held that the right to possession could be inferred from facts that the customer ordered the 1¢ stock and that by mistake the broker delivered the 25¢ stock, which the customer retained. (L.c. 780–781, 783–784; notes 2 and 12.) (2) Although the broker was not the owner of the stock, it was a bailee for the owner; and when it placed the stock in the hands of one having no right thereto, the broker

had an immediate, unconditional right to possession, sufficient to maintain the action for conversion. (L.c. 782; notes 5 and 6.) (3) After the broker replaced the missing certificate for 300 shares of 25¢ stock by purchasing other such stock, it billed the defendant for the cost thereof; and the defendant contended, therefore, that title had passed to him and that the broker no longer had the necessary property right in the stock to support an action for conversion. We ruled that the billing was not for the purchase price of the converted 25¢ stock, but was a statement of the broker's damage for replacing that stock; that the act of billing did not detract from the broker's right to possession of the originally misdelivered stock. (L.c. 781; note 4.) (4) The defendant contended the plaintiff-insurer could not recover because it was a volunteer surety. This, on the theory that (a) its policy excluded any loss the broker had sustained because of an unpaid account, and (b) when the broker billed the defendant for the cost of replacing the converted stock, an account existed between the broker and the defendant; hence, the broker's claim was an account, not covered by plaintiff's policy. We ruled that the broker's loss grew out of the conversion, not out of an unpaid account; that the final billing was merely a statement of the measure of the broker's damage which it had previously sustained. The rulings on each of these four issues answer most of the questions now before us.

On this appeal the defendant's first point is that the trial court erred in denying his motions for a directed verdict. This, on three grounds. Initially, he contends that the evidence showed only a unilateral mistake by the plaintiff, not a mutual mistake by both parties. Defendant cites numerous equity cases holding that equity will not rescind a contract for a unilateral mistake. This principle does not aid the defendant, first, because this is a common-law action for conversion, not a suit in equity; second, because the broker is not attacking the parties' contract but, instead, is relying

on it; and, third, because the mistake was not in the making of the contract but in its fulfillment. To support this contention further, the defendant relies heavily on the case of Houston v. Welch, 204 Mo.App. 279, 223 S.W. 1076. That case is akin to ours only in that it concerned the sale of stock of corporations with similar names. In all else it differs. It was an *equity* suit for *rescission* of a sale of stock based on the unilateral *mistake of a third party* made at the inception of the contract. The case does not support defendant's contention of unilateral mistake.

■ Pressing on with his claim for a directed verdict, the defendant next charges that the evidence failed to establish the essential elements of a conversion. The case of Eisenberg v. Nelson, Mo.App., 247 S.W. 244, crisply defines the common-law tort of conversion, at l. c. 247: "Any distinct act of dominion wrongfully exerted over the personal property of another in denial of or inconsistent with the latter's rights therein constitutes a conversion." The element of the broker's property interest in the American Invest*ment* stock was sufficiently shown to qualify it to maintain an action for conversion. (Issues 1 and 3 of the Hochman case, supra.) The element of the defendant's knowledge of the broker's mistake may not have been essential to plaintiff's case. See Schulte v. Florian, Mo.App., 370 S.W.2d 623 [4]. Nonetheless, the plaintiff pleaded and submitted the issue of defendant's knowledge of having received the wrong stock. Knowledge, like intent, is a state of mind and may—and usually must—be proved by circumstantial evidence. Herrman v. Daffin, Mo.App., 302 S.W.2d 313 [5]; State v. Chevlin, Mo., 284 S.W.2d 563 [4]; 20 Am.Jur., Evidence, § 336, note 8. On this submitted issue of defendant's knowledge that he had received the wrong stock, there was evidence that on March 16 Mr. Trippe knew the American Invest*ors* stock which he had ordered was selling for less than $2.25; that just two days later he learned that the American

Invest*ment* stock he had received was selling for more than $20; that he immediately began selling it in small lots through other brokers; and that the next month he falsely led the broker's agent, Mr. Spiegelhalter, to believe that he still had the stock. From this evidence the jury could have reasonably inferred that the defendant knew he had received the wrong stock. The broker's right to possession of the misdelivered stock was thereby established. It follows that Mr. Trippe's subsequent sale of the American Invest*ment* stock was an unauthorized act of dominion over the stock and constituted a conversion thereof. Blum v. Frost, 234 Mo.App. 695, 116 S.W.2d 541 [4–6].

■ The defendant advances one last ground for a directed verdict. He argues that the plaintiff-insurer was not a proper party; that it cannot sue because it was a volunteer surety since it paid the broker's claim although not liable therefor under the broker's policy. As in the Hochman case, supra, the policy excluded liability for any loss the broker sustained on an unpaid account. As we ruled in the Hochman case (issue 4), the broker's loss was caused by the conversion, not an unpaid account. This, because the final billing was no more than a statement of the measure of the broker's damage which it had previously sustained.

Accordingly, we rule that the trial court wisely denied the defendant's motions for a directed verdict. The remaining issues concern the defendant's challenges to the plaintiff's verdict-directing Instruction No. 2. Defendant has failed to comply with Civil Rule 83.05(a), V.A.M.R., which requires that he set out the instruction in the argument portion of his brief. The plaintiff has done so, however, and we will consider the merits of the defendant's complaints.

■■ There was no applicable instruction in MAI, so the plaintiff complied with Civil Rule 70.01(e), MAI, by the following

instruction which directed a verdict for plaintiff upon the jury's believing:

"First, defendant Trippe placed an order with Merrill Lynch, Pierce, Fenner and Smith for the purchase of 500 shares of stock of American Investors Corporation, and

Second, defendant Trippe received from Merrill Lynch, Pierce, Fenner & Smith 500 shares of stock of American Investment Company of Illinois, and

Third, defendant Trippe, on March 21, 1961, with knowledge that he had received the wrong stock, claimed a right to control or dispose of said 500 shares of stock of American Investment Company of Illinois."

The defendant complains first that the instruction failed to require a finding that the plaintiff had the right to immediate possession of the stock. That was not necessary. It was sufficient that the instruction did hypothesize facts from which that conclusion of law naturally followed. (Issue 1 of the Hochman case, supra.) Next, defendant complains that Instruction No. 2 failed to hypothesize the fact of the broker's mistake. Defendant cites no cases in support of this point nor expands on it in his argument. Assuming, *arguendo*, that this was essential, it was fairly met by the hypotheses in paragraphs "First" and "Second" and the added requirement in paragraph "Third" that defendant "received the wrong stock." The instruction is invulnerable to the defendant's attacks.

The learned trial judge allowed the defendant full range to present his case, even to the extent of giving his proffered instructions on the implausible defenses of unilateral mistake, absence of fraud, and volunteer surety. Although the defendant was armed with these weapons, the plaintiff convinced the jury that the defendant had unjustly enriched himself and that the plaintiff was entitled to recover. We agree.

We find no merit in the points raised by defendant. The judgment should be affirmed.

PER CURIAM.

The foregoing opinion of CLEMENS, C., is adopted as the opinion of this court. Accordingly, judgment is affirmed.

WOLFE, P. J., and ANDERSON and RUDDY, JJ., concur.