Carrol D. REASON, Respondent,

v.

Dorris O. PAYNE, Sharon J. Payne, David Harline and Savings of America, Inc., a California Corporation, Appellants.

No. 56516.

Missouri Court of Appeals,
Eastern District,
Southern Division.

June 12, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 11, 1990.

Application to Transfer Denied
Sept. 11, 1990.

Benjamin F. Lewis, Cape Girardeau, for appellants.

Albert C. Lowes, Michael H. Maguire, Cape Girardeau, for respondent.

CRIST, Judge.

This appeal arises out of an action by respondent Carrol Reason against appellants Dorris and Sharon Payne, husband and wife, for the conversion of a bank account. A jury found for Carrol Reason, awarding her a total of $26,217.99 in actual damages and punitive damages of $2,500 against each appellant. The trial judge entered a judgment consistent with the verdict. As to the award of actual and punitive damages against husband, Dorris Payne, we reverse and remand. The award of actual and punitive damages against wife Sharon Payne is affirmed.

Lorenzo Payne (father) a long-time resident of Portageville, Missouri, died February 28, 1987. He was married to Cecil

Rome who bore him two children, appellant Dorris Payne and George Payne. Cecil died in 1935. Father did not remarry but he cohabitated with Lorene White for eleven years. Respondent-plaintiff, Carrol Reason, was born to Lorene White in 1942 and father was named on the birth certificate as her natural father.

Father opened three accounts at what would become Home Savings of America in Portageville on August 31, 1979. These accounts are referred to in the transcript as savings accounts, money market accounts and certificates of deposit. These accounts were in the names of father and Dorris Payne; father and George Payne; and father and Carrol Payne Reason. In each account, the owners were joint tenants with right of survivorship with the child's social security number appearing thereon. Father deposited an equal amount in each of these three accounts. All of the money in the accounts was from father. Father gave the children money with which to pay the income taxes imposed on the interest earned.

In the years before father's death, Carrol Reason and her husband operated a bar in St. Louis. Father invested in this bar in the early to mid-seventies. His investment was lost when the liquor license expired in 1982 after Carrol's husband was killed and she was charged with capital murder. Father paid at least $5,000 of Carrol's legal fees. She was convicted of manslaughter and served one year in prison. Carrol repaid father $1,000.

Appellant Dorris Payne settled in the Cape Girardeau area. He is a heavy equipment operator. He is married to appellant Sharon Payne, a school teacher. Although Dorris had his own problems, father did not give him any money as he did Carrol. Father's other son, George, lives in Jefferson City.

In September 1986, Dr. Marvin diagnosed father as having a collapsed lung and cancer. He estimated that father would live another six months. Father left Portageville and went to live with Dorris and Sharon in Cape Girardeau. He received radiation treatments there five days a week for six weeks.

While at Sharon and Dorris' home, Sharon cooked, cleaned and washed for father. He had his own room and brought some of his own furnishings with him. During his stay, Carrol visited father once in November 1986.

Around February 17, 1987, the Portageville branch of Home Savings received a letter in the mail dated February 11, 1987, purportedly signed by Lorenzo Payne. This typewritten letter directed Home Savings to remove Carrol's name from the account and to add the name of appellant Sharon Payne. It also requested Carrol's name be removed from a joint checking account. The checking account is not in issue in this case. Home Savings mailed signature cards for the new accounts to father at Sharon and Dorris' home. The new signed signature cards were mailed back.

On February 14, 1987, father was admitted to St. Francis Hospital. He was comatose, unresponsive to stimuli and suffering from seizures. He died at Southeast Hospital February 28, 1987. On March 2, Carrol went to Home Savings in Portageville to withdraw the money so she could pay one-third of the funeral expenses. She was informed the account was closed. She was shown the letter from father, whereupon she pronounced it as a forgery and accused her brothers as the forgers.

Home Savings placed a hold on the account because of the questions raised by Carrol. No withdrawals had been made after the funds were transferred to the new account. The balance of the account was later paid into the court on February 28, 1989, on a stipulation which dismissed with prejudice defendants Savings of America and a bank officer, David Harline.

At trial, Carrol's expert, William Storer, testified the Lorenzo Payne signature on the letter, the signature card for the checking account and a check for $45 payable to Shoss Radiology were written by someone other than Lorenzo Payne. He testified these signatures could have been made by the same person. He examined the signa-

tures of Dorris and Sharon Payne and Carrol Reason but could not say if any of them had made the questioned signatures. Storer did not examine the new signature card for the new account. Neither he nor any other witnesses testified the signature of Lorenzo Payne on that card was a forgery.

Carrol called a witness at trial who said she had known father for over forty years. She testified the signature on the letter was not father's. She also stated how father had always treated Carrol, George and Dorris equally, never showing favoritism to any one. Finally, she told how father had told her the benefits of opening joint certificates of deposit in order to pass money on to loved ones without going through probate.

Carrol testified father had never denied, at least to her that he was indeed her natural father. She also claimed father had always treated the three children equally. Upon reading the letter, she immediately noticed that her name was twice misspelled C–A–R–O–L. Such a spelling did appear on the original Carrol and father account prepared by the bank in 1979. However, the evidence showed father had consistently spelled her name C–A–R–R–O–L throughout his life.

The jury returned a verdict for Carrol. Sharon and Dorris now appeal. The first issue is whether conversion was the proper cause of action under which Carrol could recover the money.

■■■ A conversion is "any distinct act of dominion wrongfully exerted over one's property, in denial of his right or inconsistent with it." *Kansas City Casualty Co. v. Westport Avenue Bank*, 191 Mo.App. 287, 177 S.W. 1092, 1093–94 (1915). It may be proved "(1) by tortious taking; (2) by any use or appropriation to the use of the person in possession indicating a claim of right in opposition to the rights of the owner, (3) by a refusal to give up possession to the owner on demand." *Arnold v. Prange*, 541 S.W.2d 27, 30 (Mo.App.1976). Money represented by a general debt is not subject to a claim for conversion. *Brandhorst v. Carondelet Savings and Loan Association*, 625 S.W.2d 696, 699[3] (Mo.App.1981).

However, misappropriated funds placed in the custody of another for a definite purpose may be subject to a suit for conversion. *Boyd v. Wimes*, 664 S.W.2d 596, 599[7] (Mo.App.1984). Monies in a fund secured by a creditor's security agreement over a bankruptcy debtor's accounts receivables can also be collected by an action in conversion. *In the Matter of Koran Enterprises*, 61 B.R. 321, 327 (Bankr. W.D. Mo.1986).

■■ Appellants, the Paynes, argue the original Carrol and Lorenzo account was not a specific chattel because it was a savings account and is not subject to conversion. Carrol argues the money was in a certificate of deposit or a money market account. The testimony on this point is inconsistent.

The attorneys in this case both referred to "the C.D." during trial. An employee of the savings and loan referred to "the C.D." but later said it must have been a savings account because no penalties were assessed when the names were changed. Carrol's verdict-directing instruction posed the question whether "Account No. 217–000168–5" was converted. The signature card implies what was involved was some form of savings account.

The question becomes whether we are to be controlled by the mere form of the sum involved; a C.D., an account or cash. In substance, Sharon Payne benefited equally whether she possessed a C.D. worth $26,217.99; became the surviving joint tenant of a $26,217.99 account; or acquired currency tucked away in a mattress totaling $26,217.99. In *Brandhorst*, 625 S.W.2d at 698, funds given to a savings and loan by a debtor were not applied to the debt. The monies were placed in the custody of the savings and loan for a definite application and were misappropriated. *Id.* at 699. The plaintiff sought an amount in damages equal to the amount given to the teller, not the same currency as if it were a chattel. Neither did the plaintiff try to reclaim a specific representation of money, like a check or certificate of deposit. *Id.* In substance, an identifiable sum was involved.

In cases from other states, a savings account may be the subject of a conversion action if the money can be specifically described or identified. *Erhardt v. Leonard*, 104 Idaho 197, 657 P.2d 494, 498 (1983). In *Republic of Haiti v. Crown Charters, Inc.*, 667 F.Supp. 839, 845 (S.D.Fla.1987) money diverted from the Government of Haiti's treasury and deposited in a Florida bank was recovered through a conversion action. When the money was withdrawn from the treasury's account, it took on an identifiable character. *Id.* at 846. When deposited in Florida, the only funds in the new account were from the Haitian government. The money never lost its identity. *Id.*

In the case at bar, the father and Carrol account was opened for the purpose of disposing of father's estate. It was specific and identifiable. No withdrawals were made. The only deposit to speak of was the accumulation of interest.

The new father and Sharon account was created by merely substituting Sharon's name for Carrol's. No withdrawals were made between the time the new account was created and the time the account was frozen. It was never commingled with any other funds. The sum remains specific and identifiable. Therefore, the account could properly be the subject of a conversion suit.

The Paynes challenge the sufficiency of Carrol's "Not in M.A.I." verdict-directing instruction. It stated:

Your verdict must be for plaintiff on her claim for conversion against defendants if you believe:

First, plaintiff as a co-owner of the Account No. 217–000168–5 with decedent Lorenzo Payne was entitled to immediate right to possession of same, and

Second, defendants caused the account to be closed and transferred to defendant Sharon Payne by forgery of decedent Lorenzo Payne's signature, and

Third, plaintiff was thereby damaged.

Under Rule 70.02(e), instructions must be "simple, brief, impartial, and free from argument." Carrol's instruction required the jury to find the essential elements of conversion, namely; Carrol had a right to pos-

sess the account; that Sharon Payne now possessed the account; and Sharon Payne's possession was wrongful because it was procured by forgery. *Fireman's Fund Insurance Company v. Trippe*, 402 S.W.2d 577, 581–82 (Mo.App.1966). *See Boyd v. Wimes*, 664 S.W.2d 596, 598–99 (Mo.App. 1984).

■ However, we agree with the Paynes insofar as they allege Dorris Payne cannot be found jointly liable with Sharon Payne for conversion. A cause of action for conversion is based on the wrongful possession of property. *Fireman's Fund Insurance Company*, 402 S.W.2d at 581. Here the evidence shows Sharon Payne possessed the account in question. The award of damages against Dorris was unjustified. He did not possess the account nor was there sufficient evidence he conspired with Sharon to obtain it. Therefore, we reverse the judgment for damages against Dorris Payne.

The Paynes next argue they were entitled to a directed verdict because the evidence did not prove they caused the account to be changed by forgery. We perceive this point as going to the sufficiency of the evidence. However, we wish to first address the form of the Paynes' argument under this point.

■ Throughout the argument portion of their brief, the Paynes claimed: (1) Proof of the term "forgery" in Carrol's verdict instruction necessitated proof of fraudulent intent, and (2) the evidence failed to prove the Paynes intentionally perpetrated a fraud. Essentially, this argument goes to the point in their motion for a new trial that a definitional instruction of "forgery" should have been submitted requiring proof of the additional elements. The problem is the Paynes offered no such instruction. *DeClure v. Murrell*, 717 S.W.2d 237, 240[4] (Mo.App.1986).

The failure to submit a definitional instruction requiring proof of additional elements to prove forgery has not been preserved for review. We will not judge the sufficiency of the evidence in light of those additional unpreserved elements no matter

how they are couched or intertwined within the brief.

The term "forgery" is a word of common usage. It is not calculated to confuse the jury. *Frantz v. State Farm Mutual Auto Ins. Co.*, 526 S.W.2d 345, 349 (Mo.App.1975). The real question is whether the evidence was sufficient for the jury to believe the account was procured by forgery making Sharon Payne's possession of it wrongful. We believe so.

Carrol's handwriting expert opined the letter instructing the bank to remove Carrol's name from the account was not signed by father. Neither were a check dated February 28, 1987 and a checking account signature card dated February 24, 1987. While it is true the expert could not render an opinion as to who forged father's signature, there was substantial evidence for the jury to believe forgery took place.

Father lived with Dorris and Sharon beginning in September 1986. The forged letter was dated February 11, 1987. Twice within the body of the letter, Carrol's name was misspelled. Dr. Shakil believed it would have been impossible for father to have handled his affairs from a few days to two weeks before February 14, 1987, when admitted to the hospital. Admission records also indicated Sharon Payne stated father had been "lethargic" for the past two weeks.

While hospitalized, father's condition improved to the point where he could walk. However, hospital records described his cognitive/perceptual patterns as "pleasant" and "confused" during the time in which he allegedly signed the new signature card to the Sharon and Lorenzo account. Records also show father, at times, slept with and asked inappropriate questions to a "teddybear" given to him by his grandchildren. Sharon and Dorris claimed to have had no duty to inform Carrol that father was on the brink of death. They waited almost ten hours to call Carrol after he died. Sharon *benefited directly from* the change in the account precipitated by a forged letter. The jury could have concluded the Carrol and Lorenzo account was transferred to Sharon Payne by forgery.

The Paynes next assert that under § 369.174.1, RSMo 1986, the fact Sharon's name appeared on the account at the time of father's death created a conclusive presumption of the intent that title should vest solely in her absent fraud or undue influence. The relevant portion of the statute states:

> The opening or maintenance of the account in such form, in the absence of fraud or undue influence, shall be conclusive evidence ... of the intention of all the parties to the account to vest title to the account ... in the survivor. A person may be added or removed as an owner of an account upon the written direction of any owner of the account upon whose signature withdrawals may be made from the account.

§ 369.174.1, RSMo 1986.

Applying the unambiguous language of the statute, the original account was opened in Carrol's and father's names. A finding of fraud or undue influence would be required to overcome the conclusive evidentiary value of the joint titling if Carrol was the surviving joint tenant. *Estate of Smith*, 767 S.W.2d 29, 37[7] (Mo. banc 1989). However, in order to remove Carrol and add Sharon Payne to the account, written directions by an owner (father) upon whose signature withdrawals could be made were required.

The written directions ordering the change were not signed by father. Therefore, the Carrol and father account was not effectively terminated. *See McGee v. St. Francois County Savings and Loan Association*, 559 S.W.2d 184, 188 (Mo. banc 1977). The statutory presumption father intended Sharon to become the sole owner of the account upon his death did not arise. *See Estate of Sheets v. Sheets*, 558 S.W.2d 291, 295 (Mo.App.1977).

The Paynes' fourth point relied on states no punitive damage instruction should have been submitted because Carrol failed to make a submissible case for actual damages. Having found Dorris Payne was not liable for actual damages under the conversion claim, we reverse the award of puni-

tive damages against him. *Maples v. Charles Burt Realtor*, 690 S.W.2d 202, 214[27] (Mo.App.1985). Because the evidence was sufficient to prove Sharon Payne converted the account, and given the limited scope of the point presented on review, the award of punitive damages against her is affirmed. *Boyd v. Wimes*, 664 S.W.2d 596, 599 (Mo.App.1984).

Point five alleges: First, the deposition testimony of Dr. Shakil was not relevant to whether the Paynes' forged father's signature; and second the testimony was speculative.

Dr. Shakil testified father was unresponsive when brought to the hospital on February 14, 1987. He also opined father would not have been able to handle his affairs from a few days to two weeks before going into the hospital. Also, after admission, father was unable to handle his affairs.

As to the relevancy issue, the Paynes argue the testimony may have been admissible to show undue influence, but undue influence was not an issue. Furthermore, the testimony, as it relates to only mental capacity, does not prove forgery. We disagree.

■ Relevant evidence tends to prove or disprove a fact that is of consequence and makes that fact more probable or less probable than it would be without it. *Lawson v. Schumacher & Blum Chevrolet, Inc.*, 687 S.W.2d 947, 951[1] (Mo.App.1985). *See* Fed.R.Evid. § 401. Testimony concerning father's diminished physical and mental capabilities at the time the letter was executed tended to make it more probable that he did not write or sign the letter. The same holds true with his ability to physically execute the signature card immediately before his death. Therefore, the doctor's testimony was relevant.

■ As far as the claim the doctor's opinion was speculative, the question is whether he had an adequate factual basis upon which to base his opinion. *Wiley v. Pittsburg and Midway Coal Mining Co.*, 729 S.W.2d 228, 232 (Mo.App.1987).

Dr. Shakil is a neurologist with over ten years of experience in his field. He based his opinion on facts known to him after seeing over one hundred patients in the condition of father. The doctor saw father when admitted and while hospitalized. He reviewed father's medical records and consulted with father's treating physician. The factual basis for Dr. Shakil's opinion was sufficient to remove his opinion from the realm of speculation. *Wiley*, 729 S.W.2d at 232–33. Any weaknesses went to the weight rather than the admissibility of his testimony. *Hall v. W.L. Brady Investments, Inc.*, 684 S.W.2d 379, 388 (Mo.App.1984). There was no error in allowing his testimony to be read to the jury.

Point six alleges the trial court erred by refusing to admit a certified copy of Carrol's indictment for murdering her husband and a certified copy of her conviction for manslaughter. The Paynes also allege the court erred when it ordered the jury to disregard their lawyer's remark during opening statement that Carrol was arrested for her husband's murder.

During direct examination Carrol testified she was charged with manslaughter. She also admitted being convicted of manslaughter but then denied doing it. Before cross-examination, the Paynes' lawyer stated his intention to introduce both the indictment and conviction. The trial court excluded the indictment altogether and told counsel he could either cross-examine Carrol about the conviction or introduce the certified copy during the Paynes' case in chief. He chose to cross-examine. Carrol answered unequivocally that she was convicted of manslaughter and served one year in jail.

■ A witness may be impeached with proof of a prior conviction by introducing a record of the conviction or by cross-examination. *Eichelberger v. Barnes Hospital*, 655 S.W.2d 699, 704[4] (Mo.App. 1983). The Paynes were not prejudiced by being limited to cross-examining Carrol. There was no reversible error in excluding the conviction record.

■ As far as the murder indictment is concerned, a witness may not be impeached

by a mere accusation, arrest or criminal charge not resulting in a conviction. *Klein v. General Electric Co.*, 714 S.W.2d 896, 905 (Mo.App.1986). The Paynes argue the indictment was relevant to show Carrol "lied" to the jury during direct examination. We quote the "lie" from the transcript:

Q: [Carrol's Lawyer]: Have you ever been convicted of a crime ...?

A: [Carrol] Yes sir.

Q: What was the crime?

A: I was charged with manslaughter of my husband.

■ The Paynes have cited no cases remotely relating to what foundation would be required to introduce the indictment or how the trial court abused its discretion in refusing the evidence. This issue has been abandoned. *Ortmeyer v. Bruemmer*, 680 S.W.2d 384, 396[31] (Mo.App.1984).

■ Finally, the Paynes' argument concerning the remark during their lawyer's opening statement can be summarized as claiming the trial court made them "look bad." Be that as it may, the trial court has broad discretion in controlling the conduct of counsel. *Missouri Commercial Investment Co. v. Employers Mutual Casualty Co.*, 680 S.W.2d 397, 401[9] (Mo.App.1984). Given the general inadmissibility of evidence of a witness's prior arrests, we fail to see how the trial court abused its discretion by properly instructing the jury to disregard counsel's improper remark. Point denied.

Point seven. The Paynes attempted to read to the jury portions of the transcript in *Payne v. White*, 288 S.W.2d 6 (Mo.App. 1956). Within that transcript was testimony by father that he never had "personal relations" with Carrol's mother and that she was merely his housekeeper. The trial court excluded the evidence. The Paynes next offered a portion of the appellate opinion in the *Payne v. White* case in which was summarized father's denial of paternity. This evidence was also excluded.

■ In their brief, the Paynes merely cite abstract statements of law as to the hearsay rule and the test for relevancy.

No cases were cited from this or any other state setting forth how the uncertified transcript offered here was admissible. We were not provided with any cases applying the hearsay rule, or one of its many exceptions, to the statements found in the appellate opinion. Nor is there support for the claim the trial court abused its discretion by refusing to take judicial notice of the facts contained in the opinion or for not allowing it to be read to the jury.

We will not search the universe for case law in order to determine if the trial court erred. Such a search is beyond that properly preserved for review. *Bishop v. Bishop*, 618 S.W.2d 261, 263[1, 2] (Mo.App. 1981).

■ Did the trial court abuse its discretion when it found the proffered evidence was irrelevant? No. *Moreland v. State Farm Fire and Casualty Co.*, 662 S.W.2d 556, 565[15, 16] (Mo.App.1983).

The judgment as pertaining to Dorris O. Payne is reversed. In all other respects the judgment is affirmed.

SIMON, C.J., and CARL R. GAERTNER, J., concur.